**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **MECCATECH, INC.,** | ) | **CASE NO. 8:05CV570** |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM AND ORDER** |
| **CLAUDIA KISER, SARAH SHEPHERD, PAT BARIL, STRATEGIC GOVERNMENTAL SOLUTIONS, INC., NEBRASKA ASSOCIATION OF SCHOOL BOARDS,** | ) | **DENYING MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | ) | |

The Plaintiff's Motion for Preliminary Injunction (Filing No. 3) was heard on Monday, March 6, 2006. The Plaintiff, MeccaTech, Inc. ("MTI"), alleges that the Defendants engaged in unlawful conduct that caused MTI to lose its business with 170-80 Nebraska school districts with which it had contracted to provided Medicaid reimbursement services. Defendants Claudia Kiser, Sarah Shepherd, and Pat Baril are former employees of MTI who now work for Defendant Strategic Governmental Solutions, Inc. ("SGS"). The other Defendant, the Nebraska Association of School Boards ("NASB"), organized certain Nebraska school districts into a Consortium in February 2005, and, on the member districts' behalf, the NASB Consortium contracted with SGS to have SGS take over the member districts' Medicaid reimbursement contracts for the 2006 calendar year. MTI contends that the Defendants tortiously interfered with MTI's business relationships and engaged in a civil conspiracy to defraud MTI of its Nebraska business in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-1968 (2000).

The Defendants deny wrongdoing and argue that preliminary injunctive relief is not warranted in this case. Defendants contend that MTI cannot show that there is an imminent threat of irreparable injury or that it is likely to succeed on the merits of the case. Defendants contend that the *Dataphase*[1] elements weigh against the issuance of preliminary injunctive relief.

## Jurisdiction

MTI alleges jurisdiction pursuant to 28 U.S.C. § 1332 and § 1331. MTI's state of incorporation and principal place of business is Michigan. All the Defendants are citizens of Nebraska, with the sole exception of SGS, which is incorporated in Delaware and has its principal place of business in Colorado. MTI alleges, and there appears to be no dispute, that the amount in controversy exceeds the jurisdictional threshold amount. Federal question jurisdiction is based on the Defendants' alleged violation of RICO.

## Factual Background

MTI and SGS provide services to school districts across the country. Such services include seeking reimbursement for administrative expenses incurred by districts in connection with providing Medicaid benefits to students. From 1999 through 2005, MTI had contracted with approximately 170 Nebraska school districts to file, on the districts' behalf, applications seeking reimbursement of Medicaid-associated expenses from the state-run Medicaid program. As part of the service, MTI traditionally had calculated and paid each district's mandatory fee to the State, calculated and paid its own service fee, and calculated and paid a royalty to the NASB. For calendar year 2006, SGS has the contract to perform the work for the districts. (Bonaiuto Aff. at Ex. H).

---

[1] *Dataphase Systems, Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981)(en banc).

Facts relevant to MTI's claims begin at least as early as January 2005, when MTI presented several of its employees, including Pat Baril, with non-competition agreements and asked the employees to sign the agreements. Baril refused to sign such an agreement. MTI alleges that evidence of the Defendants' conspiracy exists as early as February 2005, when Baril and the NASB's Executive Director, John Bonaiuto, launched the NASB Consortium. MTI contends that the Consortium permitted the Defendants to further their conspiracy to deprive MTI of its business and to conceal their activities.

The Defendants contend that the Consortium was formed for legitimate business purposes. In a memorandum dated January 19, 2005, Baril informed the school districts of the formation of the NASB Consortium. (Complaint ¶ 17). Nebraska school districts could join the Consortium voluntarily, and any school district could leave the Consortium with 30 days' notice. (Filing No. 28, Bonaiuto Aff. ¶ 14, 41). By executing a letter of agreement, any school district that joined the Consortium empowered the NASB to act as its agent and to facilitate the transfer and payment of Medicaid reimbursement funds between the State, its Medicaid agency, and any third-party associated with billing services. (Filing No. 28, Bonaiuto Aff. ¶¶ 17-20; Ex. F).

In their affidavits, Baril and Bonaiuto explain that the Consortium was formed to simplify the paperwork and reduce the number of financial transactions involved in the Medicaid reimbursement process. Before the Consortium was formed, the paperwork and checks for the approximately 170-80 individual school districts with which MTI contracted were processed separately. Thus, 170 to 180 requests for reimbursement were sent to the federal government; 170 to 180 checks were issued by the federal government and sent to MTI; and each individual district's fees were calculated by MTI and monies disbursed

3

accordingly. After the Consortium became effective,[2] MTI, as the Consortium members' third-party billing agent, submitted one request for reimbursement of administrative expenses to the state-run Medicaid program for each quarter, and the Medicaid program issued one check to MTI. Before distributions were made to individual districts, MTI paid one mandatory state fee on behalf of the Consortium's members, issued one check to the NASB representing the entire royalty payment for the Consortium's members, and retained its payment for services rendered. MTI then divided and distributed the remaining proceeds to the Consortium's individual districts. (See Filing No. 26, Baril Aff. at ¶3 and Ex. D, and Bonaiuto Aff. at ¶ 14 -20 and Ex. F "Letter of Agreement").

The Consortium members delegated additional power to the NASB effective July 1, 2005, pursuant to which the NASB obtained authority to contract with third-party billing agents on the Consortium members' behalf. This expansion of authority was accomplished through additional letters of agreement. (Bonaiuto Aff. ¶ 33 and Ex. I). I have no doubt that operating through the Consortium increased efficiencies in the payment process and streamlined the financial paperwork. MTI contends, however, that the creation of the Consortium also allowed the Defendants to further their scheme to defraud MTI and to conceal their actions. Whether this ulterior motive existed or can be proven at trial remains to be decided, but, as will be discussed more fully below, the timing of several events lends credence to MTI's theory.

Around the same time that the Consortium was formed, in February 2005, Gary Lange came to Nebraska to visit with John Bonaiuto. Lange's and Bonaiuto's personal relationship had developed during the years that Lange was employed as the President

---

[2] It appears that the Consortium was established and the new procedures became effective by the second quarter of 2005.

4

and Director of National Sales for MTI and had worked extensively with the NASB. In February 2005, Lange resigned from MTI and commenced employment with SGS. (Filing No. 48, Tyler Aff. at Ex. A). The purpose of Lange's visit with Bonaiuto was to introduce SGS and its services, including Medicaid reimbursement services. Also in February, Bonaiuto learned that MTI was in receivership. Bonaiuto cannot recall the source of this information. (Bonaiuto Aff. at ¶¶ 21, 22).

In March 2005, SGS began to recruit MTI employees, including Baril, to work for SGS. Baril gave MTI two weeks' notice of his resignation on April 6, 2005, and began working for SGS at the latest, on April 21, 2005. (Filing No. 26, Baril Aff. at ¶ 8). There is some evidence, including an April 3, 2005 e-mail from Baril to his co-defendants, that Baril may have assisted SGS in recruiting other MTI employees to SGS while he was still employed by MTI. (Filing No. 39, Smith Aff. Ex A). The April 3, 2005, e-mail includes Baril's response to a question by Kiser related to the difference in the cost of health insurance premiums paid by MTI and SGS employees, and whether Kiser's salary could be increased to compensate for that difference. The e-mail also includes Baril's statement that: "if we get all the schools to transfer over this most definitely will not be a problem...." (*Id.*, see also Filing No. 44, Baril Supp. Aff. ¶3).

It also appears that from at least as early as May 1, 2005, through mid-July 2005, Baril, Shepherd, and Kiser were collecting correspondence from the school districts that expressed the school districts' intention not to renew their contracts with MTI. In e-mails between Baril, Kiser, and Shepherd dated May 9, 2005, it appears that they were keeping track of the districts that had sent non-renewal notices to them and those that had not. (Filing No. 39, Smith Aff. at Exs. B and C). Although Bonaiuto was on one e-mail distribution list, he denies any recollection of it and he maintains that he did not participate

in the solicitation or collection of the letters. (*Id.* at Ex. B, Filing No. 42, Bonaiuto Supp. Aff. ¶¶ 3-6). In addition, despite a contractual requirement that such "non-renewal letters" be sent directly to Gary Tyler, Baril directed the school districts to use a form letter he prepared that was addressed to Tyler, although the mailing address was either Baril's address or MTI's Omaha address. Thus, many of the letters were mailed directly to Baril, who was then employed at SGS, and others were mailed to Shepherd at MTI's Omaha address. Shepherd did not inform her superiors at MTI that she had received non-renewal letters during this time. In fact, Tyler had knowledge of only a single non-renewal letter that was mailed directly to him, until he received a packet from Bonaiuto containing 175 non-renewal letters on July 11, 2005. (Filing No. 5, Tyler Aff. at ¶¶ 12, 14-18; see Filing No. 39, Bonaiuto Aff. ¶11). The districts were contractually required to give MTI only 90 days' notice of their intention not to renew the contract, and MTI does not dispute the fact that it possessed the non-renewal letters in advance of that deadline.

In correspondence dated May 24, 2005, NASB notified MTI that NASB was terminating its royalty agreement with MTI. Under that agreement, NASB had been paid a percentage of the MTI fee for the services it provided to the districts, effective June 30, 2005. (Filing No. 5, Tyler Aff. ¶ 13). Tyler contacted Bonaiuto immediately to investigate the termination, and Bonaiuto told Tyler that NASB was looking at all contracts that had an automatic renewal provision, and that the notice did not signal any problem with MTI nor a change in course. (*Id.*).

On June 20, 2005, NASB's Board of Directors authorized the NASB on behalf of the Consortium to contract with ESP, a division of SGS, for Medicaid reimbursement services. (Filing No. 28, Bonaiuto Aff. at ¶ 27). On June 22, 2005, weeks after the first district's non-renewal letter was delivered to one of the Defendants, Tyler received a non-renewal letter,

6

that was mailed directly to him from the superintendent of the Milford Public School District. (Filing No. 39, Tyler Aff. ¶ 9). After receiving the Milford notice, Tyler immediately contacted Shepherd, whom he had placed in Nebraska following Baril's resignation, and she assured him that Milford was unique and that she knew of no other district that would not renew its contact. (*Id.* at ¶ 12).

On July 1, 2005, the first day that a new contract for reimbursement could be executed by NASB, a letter of agreement was executed by Bonaiuto on behalf of the NASB Consortium and ESP (Filing No. 28, Bonaiuto Aff. ¶¶ 27-28). Even though the letter of agreement with ESP had already been executed, Bonaiuto informed MTI on July 5, 2005, that the school districts had authorized NASB to serve as their agent for the Medicaid reimbursement program. On July 8, 2005, Bonaiuto sent MTI the list of school districts that had provided "him" with letters of non-renewal, and enclosed copies of the letters themselves, which Tyler received on July 11, 2005. When Tyler spoke to Bonaiuto on July 11, Bonaiuto informed MTI that the NASB had decided to contract with a different vendor for Medicaid reimbursement services. (Filing No. 39, Tyler Aff. ¶ 11). Although MTI prepared and presented a proposal to provide the Consortium's Medicaid reimbursement services for 2006, that included a significant discount from previous contracts, on July 22, 2005, NASB rejected MTI's proposal for the districts' Medicaid reimbursement business. (*Id.* ¶12).

On July 18, 2005, Shepherd and Kiser gave MTI notice of their resignations, and their employment was terminated effective July 29, 2005. (Complaint ¶¶ 34, 35). In an e-mail dated August 7, 2005, Baril communicated with the Consortium's members, stating "if any third party vendor asks you to sign a new contract, or renew a current NEBMAC contract [for Medicaid reimbursement], please inform them that you are a member of and

7

have a contract with the NASB Consortium.  Please refer them on to John Bonaiuto of NASB who is in charge of all contracts and your NASB Consortium." (Filing No. 39, Smith Aff. Ex. E).

There is little in the record regarding what actions MTI took after the end of July 2005, although MTI was clearly trying to determine why the non-renewal letters were sent, and was taking care of the districts' remaining business under the 2005 contract.  On December 14, 2005, MTI asked Baril to send its lawyer the computer MTI had provided for his use, and Baril complied.[3]

On December 29, 2005, the Complaint and the motion for preliminary injunction were filed.  The hearing was originally scheduled for February 13, 2006, but upon the Plaintiff's motion (Filing No. 29), it was rescheduled to March 6, 2006.  All evidence was filed prior to the hearing, and counsel argued their respective positions.

## ANALYSIS

In determining whether preliminary injunctive relief should issue, this Court must consider the factors set forth in *Dataphase Systems, Inc. v. C L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)(en banc).  The Eighth Circuit Court has summarized those factors as follows:

> When considering a motion for a preliminary injunction, a district court weighs the movant's probability of success on the merits, the threat of irreparable harm to the movant absent the injunction, the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest. . . .  We reverse the issuance of a preliminary injunction only if the issuance "is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise."

---

[3] Forensics work has been done on the computer, which has generated the evidence attached to the Wilson Affidavit.

8

*Pottgen v. Missouri State High Sch. Activities Ass'n.,* 40 F.3d 926, 929 (8th Cir. 1994) citing *Dataphase, supra,* and *quoting City of Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554, 556 (8th Cir. 1993) *cert. denied* 512 U.S. 1236 (1994).

The burden of establishing the propriety of a preliminary injunction is on the movant. *Baker Elec. Co-op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir 1994); *Modern Computer Sys., Inc., v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir. 1989)(en banc). "No single [*Dataphase*] factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op*, 28 F.3d at 1472 (quoting *Calvin Klein Cosmetic Corp. v. Lenox Labs, Inc.,* 815 F.2d 500, 503 (8th Cir. 1987), and also citing *Dataphase*. Each of the *Dataphase* factors is considered below.

**Likelihood of Success on the Merits**

To evaluate MTI's likelihood of success on the merits, I must consider what a plaintiff must prove to show tortious interference under Nebraska law and a RICO violation under federal law. The Nebraska Supreme Court set forth the elements of a tortious interference claim in *Huff v. Swartz,* 606 N.W.2d 461, 466 (Neb. 2000). The elements of tortious interference with a business relationship or expectation are (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. *Id.*

With regard to MTI's first claim that the Defendants tortiously interfered with MTI's business relationships with the school districts, there seems to be no dispute that MTI had valid business relationships with 170-80 Nebraska school districts in 2005, and that all the

9

Defendants, through their various roles as MTI competitors, employees, or business associates, knew of those business relationships. With regard to the third, fourth, and fifth elements of tortious interference, MTI contends that the Defendants intentionally and unjustifiably interfered with its business relationships with the school districts, or, at a minimum, interfered with the non-renewal notification process and steered school districts away from MTI to prevent it from competing for such business after August 2005. MTI has produced compelling evidence tending to show that Baril, Shepherd and Kiser were working to further the interests of SGS in direct contravention to the interests of MTI while they were still employed by MTI. There is also evidence that Bonaiuto had knowledge of the MTI employees' activities, although whether his knowledge is evidence of active participation or simple acquiescence remains to be determined. MTI also argues that the Defendants' tortious conduct is evidenced by the failure of the NASB Consortium and SGS to abide by the provisions of the Nebraska Procurement Act. Neb. Rev. Stat. § 73-501 *et seq.* (Reissue 2003). MTI contends that the NASB Consortium, as an agent of the 170-80 school districts, is a "state agency" as defined in the NPA, and as such, it was required to bid the contract for Medicaid reimbursement services publicly before accepting the contract proposed by SGS, because the contract's value was in excess of $50,000. Neb. Reb. Stat. §§ 504 (3) and (4). I am not persuaded that the NASB is a "state agency" as defined in the NPA. Thus, while this particular argument may not prevail, there remains the broader argument that MTI can demonstrate tortious interference. There is evidence that, but for the Defendants' allegedly unfair tactics, MTI would have retained the school district business in 2006, just as it had for the preceding six years, due to automatic renewal provisions.

At this early stage of the proceedings, I conclude that it is likely that MTI will succeed in showing that some, if not all, of the Defendants tortiously interfered with MTI's business relationship and expectation with the school districts. The computer forensic work that retrieved e-mail correspondence between Baril, Kiser, Shepherd and Bonaiuto is strong evidence that the Defendants were actively working and plotting against MTI, even when they had employment obligations to, or other business relationships with, MTI.

With respect to MTI's RICO claim, the United States Court of Appeals for the Eighth Circuit has explained the requirements for bringing such a civil action:

> To have standing to make a RICO claim, a party must have 1) sustained an injury to business or property 2) that was caused by a RICO violation. *Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 951 (8th Cir.1999). Then a RICO plaintiff must prove the defendant "engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Handeen v. Lemaire,* 112 F.3d 1339, 1347 (8th Cir. 1997).

*Asa-Brandt, Inc. v. ADM Investor Services, Inc.*, 344 F.3d 738, 752 (8th Cir. 2003). In proving that an "enterprise" exists, a plaintiff must show "a common or shared purpose, some continuity of personnel, and an ascertainable structure distinct from the pattern of racketeering." *Id.* citing *Handeen*, 112 F.3d at 1351.

At this early stage of the proceedings, there also appears to be a likelihood that MTI will succeed on its RICO claim. MTI has sustained an injury to its business, and there is some evidence that it would not have been injured except for the Defendants' actions. Based on the computer forensics work that has been performed, it appears that MTI may be able to show that through the use of the mail and wires, the Defendants engaged in an enterprise to defraud MTI. Whether the Defendants' conduct can be shown to be a pattern of racketeering is undetermined at this time. On the whole, however, I find that it is more likely than not that MTI will succeed on the merits of this claim.

11

Accordingly, the first *Dataphase* factor weighs in favor of the issuance of the preliminary inunction.

**Threat of Irreparable Harm**

MTI contends that it faces irreparable harm to its business goodwill and to its commercial reputation if the Court denies its motion. MTI contends that it has been prevented from fairly competing in the Nebraska market, and that it has suffered and will continue to suffer lost business opportunities based on the Defendants' unlawful behavior.[4] MTI also argues that absent the preliminary injunction, and as long as MTI is unable to bid its services, "MTI will be forever shut out of doing business with the Districts." (Filing No. 4 at p. 18).

The Defendants contend that this case presents no potential for harm that cannot be addressed adequately by money damages. I agree with the Defendants. MTI has submitted no proof, only conclusory statements and opinion, that it has sustained some type of harm that requires an equitable remedy. Assuming that MTI will suffer some financial loss due to its loss of contracts with Nebraska school districts, and assuming that the loss was caused by the Defendants' conduct, such a loss is not irreparable, because it can be compensated for by monetary damages. *See, e.g., Minnesota Ass'n of Nurse Anesthetists v. Unity Hospital,* 59 F.3d 80, 83 (8th Cir. 1995), citing *O'Connor v. Peru State College*, 728 F.2d 1001, 1003 (8th Cir. 1984).

I also note that MTI waited more than five months, from July of 2005, when it received the non-renewal letters from the school districts, to December 29, 2005, when the

---

[4] MTI also argues that when a movant demonstrates that public funds are being spent contrary to law, a court may assume the existence of irreparable harm. (Filing No. 4 p. 18). In this case, no such showing has been made, and I make no such assumption.

12

case was filed, to seek preliminary injunctive relief. While I acknowledge that it takes some time to investigate claims and to organize proof needed to support a motion for extraordinary relief, I conclude that this lapse of time weighs against issuance of a preliminary injunction, particularly where, as here, there is little evidence that MTI attempted to compete for the districts' 2006 business after July 2005. For these reasons, this second *Dataphase* factor weighs against issuance of a preliminary injunction.

### *Balance of the Harms*

In considering the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, I consider primarily the harm to MTI in the absence of an injunction and the harm to other interested parties if the injunction were to issue. MTI contends that if the Court permits the SGS and NASB contract to operate during 2006, then SGS will have received an unfair competitive advantage. There is no doubt that MTI has suffered some financial harm because it did not retain the contracts with the Nebraska school districts, and the relationship MTI had with the districts has been interrupted and may deteriorate over the coming year. However, the Defendants argue, at least as persuasively, that the Court's issuance of an injunction will throw the 170-plus school districts' Medicaid reimbursement procedures into disarray.

The Defendants also argue that the school districts, as non-parties, would be bound by a preliminary injunction only for so long as they remain members of the Consortium, which could be as brief a duration as 30 days. Assuming that the districts left the Consortium, within 30 days the districts would be free to contract with whomever they chose – SGS, MTI or a non-party to this case – regardless of the injunction. For these

reasons, I conclude that the third *Dataphase* factor, the balance of harms, weighs in the Defendants' favor, and against issuance of a preliminary injunction.

*The Public Interest*

MTI argues that the public interest is served by issuance of a preliminary injunction because the public is best served through a competitive bidding process. In addition, MTI contends that the public fisc should not be used to reward unlawful competition. The Defendants argue that issuance of an injunction would be contrary to the public interest because the 170-plus Consortium members who have contracted via the NASB with a vendor other than MTI would be adversely affected. Defendants argue that this Court should not force the school districts to contract with MTI when the school districts have already decided not to contract with MTI. The Defendants also question MTI's advocacy of the public bidding process because the service contract was never publicly bid even when MTI had the contracts.

I conclude that the public interest is best served by allowing the SGS/NASB contract to continue in operation. I am not inclined to direct the school districts to contract with a business that they recently decided to discontinue doing business with, and I am not inclined to remove service providers on whom the school districts are relying for service for the calendar year. Accordingly, this fourth *Dataphase* factor weighs against the issuance of an injunction.

## CONCLUSION

While there is evidence at this early stage of the litigation that MTI is likely to succeed on the merits of at least one of its claims, when all the *Dataphase* factors are considered, I conclude that a preliminary injunction should not issue. MTI has failed to

show that money damages are insufficient to compensate it for any harm it may sustain as a result of the Defendants' actions.  Also, there is a likelihood that the school districts' interests may be prejudiced or impeded by the issuance of a preliminary injunction midway through the term of the contract with SGS.

Accordingly,

    IT IS ORDERED:

The Plaintiff's Motion for Preliminary Injunction (Filing No. 3) is denied.

Dated this 15th day of March, 2006.

                                           BY THE COURT:

                                           s/Laurie Smith Camp
                                           United States District Judge