## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MECCATECH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 8:05CV570 |
| vs. | ) | |
| | ) | |
| CLAUDIA KISER, SARAH SHEPHERD, PAT | ) | MEMORANDUM AND |
| BARIL, STRATEGIC GOVERNMENTAL | ) | |
| SOLUTIONS, INC. and THE NEBRASKA | ) | ORDER |
| ASSOCIATION OF SCHOOL BOARDS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on plaintiff's Motion for leave to file a First Amended Complaint (Filing 199) renewing its RICO claims. All defendants object, and the matter has been fully briefed. For the reasons discussed below, I find that the motion should be granted.

## I. BACKGROUND

Plaintiff (MTI) is a Michigan company that assists school districts across the country to recover money through Medicaid reimbursements. Defendant Strategic Governmental Solutions (SGS) is a competitor of MTI. From 1999 through 2005, MTI contracted with approximately 180 Nebraska school districts to file Medicaid reimbursement claims on behalf of the school districts for Medicaid services provided to eligible students. Defendants Kiser, Shepherd, Baril (together, the "Former Employee Defendants") were formerly employed by MTI. They allegedly participated in conducting a scheme to divert MTI's Nebraska business to SGS and then accepted employment with SGS, where they continue to perform the same duties they had performed at MTI.

The Nebraska Association of School Boards (NASB) had a similar contract with MTI for Medicare reimbursement services. This contract required the NASB to support and promote MTI in marketing and administering its Medicaid Reimbursement Plans to NASB's member school boards. The NASB, however, was instrumental in organizing MTI's Nebraska client school districts into a consortium ("NASB Consortium") to act as the districts' agent for purposes of Medicaid reimbursement. The NASB then assisted in terminating the individual districts' contracts with MTI and, acting as their agent, awarded the business to SGS.

MTI's contracts with the individual school districts expired on December 31, 2005 in light of notices of non-renewal collected over a period of time by Former Employee Defendants Kiser and Shepherd, at the direction of SGS and Former Employee Defendant Baril. The Former Employee Defendants did not tell MTI they had received the notices of non-renewal and instead delivered the notices directly to the NASB. On or about July 5, 2005, NASB for the first time informed MTI via mail that over 172 of MTI's client school districts had appointed NASB as their representative or agent and requested that MTI not engage in any business contact with the individual school districts. On or about July 8, 2005, NASB mailed the notices of non-renewal to MTI. The Former Employee Defendants all resigned their employment with MTI and assumed employment with SGS.

MTI filed this lawsuit on December 29, 2005, seeking damages and other relief for defendants' alleged tortious interference with plaintiff's business relationship or expectancy;

breach of agency duty; breach of duty of loyalty; fraud; conspiracy; aiding and abetting; replevin; conversion; and pursuant to civil RICO, 18 U.S.C. §§ 1961-68, based on predicate acts of mail fraud.

Judge Smith Camp granted the defendants' motions to dismiss the originally-pled civil RICO claims pursuant to Fed. R. Civ. P.12(b).  The RICO claim against the NASB was dismissed, without prejudice, on June 7, 2006 pursuant to Rule 12(b)(6) based on Judge Smith Camp's findings that

- it could not fairly be inferred from the allegations of the original complaint that NASB was involved in the operation, management or direction of the alleged enterprise;

- no organizational pattern or system of authority between NASB and the other defendants was alleged;

- the predicate acts described in the complaint were insufficient to establish conduct of closed-ended continuity occurring over a substantial period of time;

- the allegations of fraud were not pled with the particularity necessary to infer any racketeering activity itself; and

- MTI did not sufficiently allege that NASB engaged in conduct of an enterprise through a pattern of racketeering activity.

Filing 64 at pp. 8-9.

The RICO claims against the Former Employee Defendants and SGS were dismissed, without prejudice, on August 29, 2007 pursuant to Rule 12(c) based on Judge Smith Camp's finding that it could not fairly be inferred from the allegations of the complaint that SGS and the Former Employee Defendants established an enterprise or engaged in a pattern of racketeering activity.  The judge did, however, find that

-3-

- the original complaint satisfactorily alleged "a common or shared purpose by and between the Former Employees Baril and Shepherd, and arguable SGS,"

- "one could fairly conclude that the Former Employees were involved in the operation, management or direction of the alleged enterprise. The allegations relating to the Former Employees' conduct demonstrate an active involvement in directing the actions of others, and hands-on operation of the enterprise."

Filing 194 at pp. 5-6.  (Emphasis in original).  Finally, to the extent that certain alleged mailings "helped perpetuate an alleged fraud on MTI, the allegations against the Former Employees may have been sufficient to show racketeering activity[.]"  *Id.* at p.8.

MTI was given an extension of time to September 14, 2007 to file any motions for leave to amend its complaint, due to the failure of SGS and the Former Employee Defendants to timely provide discovery.  Accordingly, on September 14, MTI filed the motion now at issue seeking, *inter alia*, to reinstate its RICO claims against all defendants pursuant to 18 U.S.C. 1964(c).[1]  The proposed pleading alleges

> 138.  The Former Employee Defendants are persons within the meaning of 18 U.S.C. § 1961(3), which persons, through a pattern of racketeering activity, maintained, directly or indirectly, said enterprise in violation of 18 U.S.C. § 1962(c).

> 139.  SGS and the NASB are persons within the meaning of 18 U.S.C. § 1961(3) and conspired with the Former Employee Defendants with respect to their pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).[2]

---

[1] 18 U.S.C. § 1964(c) provides, in part:  "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"

[2] 18 U.S.C. § 1962 provides, in relevant part:
(c) It shall be unlawful for any person employed by or associated with any enterprise

-4-

Filing 199 at p. 34 of 37.  All alleged RICO liability is predicated on acts of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343.

The proposed amended pleading contains detailed information about how MTI's former President, Gary Lange, and the Former Employee Defendants conducted business pursuant to MTI's contracts with the NASB and the individual Nebraska school districts. Lange and defendant Baril were aware of NASB's contractual obligation to support and promote MTI's services.

Lange was President of MTI from 2002 until February 16, 2004, at which time he was succeeded by Gary Tyler. Between 2002 and 2003, Lange met Joseph O'Hara, who was then the President of SGS. Lange and O'Hara, as principals of MTI and SGS, engaged in negotiations for MTI to provide services to school districts that might choose to contract with SGS.  SGS did secure such a contract with the El Paso Independent School District of El Paso, Texas (EPISD), and MTI was to provide certain services for the EPISD pursuant to SGS's contract with EPISD.  After Lange left MTI in February 2004, MTI and SGS were unable to agree to the terms of a written contract about providing services to EPISD.

Any truly cordial working relationship between SGS and MTI ended no later than July 2004 upon failure of their contract negotiations; however, defendant Baril, who was still

_____

engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ....

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

employed by MTI, traveled to El Paso on behalf of SGS, received expense reimbursements from SGS, and provided the services for SGS that MTI previously negotiated to provide.

MTI alleges that after Lange and O'Hara became acquainted in 2002 or 2003, SGS, O'Hara and Lange began conspiring to replace MTI with SGS as the provider of Medicaid reimbursement services in various states, including Nebraska. Although Lange's employment contract with MTI included a one-year noncompete agreement, Lange immediately began working with SGS and O'Hara to obtain contracts and business in direct competition with MTI. They attempted to hide Lange's involvement with SGS by making Lange an employee of The O'Hara Group & Associates, LLC (TOGA).

As early as July 2003, and continuing into 2005, SGS and Lange recruited MTI employees in Wisconsin, Michigan, Illinois, Ohio, and Nebraska to join SGS. With Lange's assistance, eleven of MTI's employees were hired by SGS, where they provided Medicaid reimbursement services to clients who were previously clients of MTI.

Gary Lange traveled to Lincoln, Nebraska–the location of NASB–on or about April 19-20, 2004. On approximately May 18, 2004, the NASB contacted SGS to discuss "the strategy and content" of a letter to be sent to MTI requesting financial information relating to MTI's past services and advising that the NASB was considering not renewing its agreement with MTI. The letter was sent on May 20, 2004 and was signed by NASB Executive Director John A. Bonaiuto. (Filing 221, p. 29 of 42).

Baril, Lange, SGS and the NASB continued to communicate with one another. On or about August 19, 2004, SGS created a Letter Agreement outlining the terms of a proposed contract between SGS and the NASB for providing Medicaid reimbursement services beginning in 2004. The agreement was drafted by Baril, Lange and O'Hara and may have been mailed or e-mailed to the NASB at that time.

No later than September 2004, Baril, the NASB (through its agents, John Bonaiuto and Dan Kosmicki), Lange, and SGS (through its agent, Joseph O'Hara) directed the formation of the NASB Consortium, allegedly as a means of diverting MTI's business to SGS. This activity was allegedly part of a larger ongoing enterprise undertaken by SGS, O'Hara and Lange, to drive down the value of MTI for the purpose of either obtaining MTI's business or purchasing MTI at a bargain price. In 2004 and early 2005, Baril (while employed by MTI), Lange (while contractually prohibited from competing with MTI), SGS, and NASB secretly drafted and revised a Letter of Agreement to create the NASB Consortium. NASB delivered the agreements to the individual school districts by mail. Baril assisted the NASB in gathering and tracking the agreements that were signed by the school districts. Baril and the NASB worked together to persuade the districts to join the NASB Consortium; this would ensure that the NASB would have the ability to select the districts' Medicaid reimbursement vendor.

Baril met with Lange and O'Hara in Lincoln on February 9, 2005 to discuss Baril's future employment with SGS. At least as of that date, Baril informed Lange and O'Hara he

-7-

would be able to transfer MTI's Nebraska contracts to SGS, in exchange for favorable employment terms with SGS. They also discussed the services SGS would provide to the NASB and the Nebraska school districts that had joined the NASB Consortium. O'Hara copied Baril on correspondence concerning this meeting. Baril did not inform MTI of the meeting or tell MTI anything about SGS's attempts to compete with MTI in Nebraska.

On March 19, 2005, Messrs. Bonaiuto and Kosmicki informed the NASB Board of Directors that the NASB would not continue to work with MTI. They proposed that the NASB, instead, enter into an agreement with SGS. Kosmicki told the Board that some of MTI's personnel were "in flux." The Board minutes indicate that as early as March 2005, the NASB had decided not to renew its contract with MTI; however, it did not inform MTI of that decision until May 24, 2005 by sending a letter (drafted by agents of SGS) to MTI's President, Gary Tyler.

After receiving the May 24, 2005 letter, Tyler telephoned the NASB and asked why it had chosen not to renew its agreement with MTI. Bonaiuto, acting on behalf of NASB, advised Tyler that the new board of directors had sent similar notices to vendors whose contracts contained an evergreen provision. Bonaiuto allegedly told Tyler that the new board did things differently and did not want contracts to automatically renew. During this conversation, Bonaiuto "expressed complete satisfaction with MTI's performance" and assured Tyler that he felt MTI's contract would be renewed.

At some point, Baril had informed SGS that MTI's Nebraska contracts ran through December 2005 and the districts would have to notify Tyler of their intent not to renew their contracts by a certain date to prevent the contracts from automatically renewing. Defendant Baril, acting in concert with the NASB and SGS, drafted letters of nonrenewal for use by the individual Nebraska school districts.   The letters stated that the districts would not be renewing their contracts with MTI.   Baril delivered the nonrenewal letters to the school districts with the knowledge and approval of SGS and the NASB.   MTI alleges that Baril and SGS (acting through its agents, O'Hara and Lange) prepared the nonrenewal letters for the purpose of defrauding MTI of its Nebraska contracts, and in furtherance of a larger scheme to take away the employees and business of MTI, diminishing MTI's value, so that they could eliminate MTI as a competitor or buy MTI's business.

Defendants Kiser, Baril and Shepherd allegedly acted in concert to induce the execution of the nonrenewal letters and collect them from the school districts.   Many of the executed nonrenewal letters were received by them as early as April 2005.   At least 172 of the nonrenewal letters were addressed to Tyler, but in care of Shepherd, and were received by Shepherd.   Baril told Kiser to forward any such letters to Shepherd.   On June 22, 2005, Tyler personally received a nonrenewal letter from a Nebraska school district and contacted Shepherd for an explanation.   Shepherd indicated it probably had to do with the NASB Consortium; he had nothing to worry about.   Shepherd assured Tyler that the Nebraska

business would continue on with MTI. She did not advise Tyler that he should expect to receive nonrenewal letters from each Nebraska school district.

At Baril's instruction, Shepherd held on to the individual nonrenewal letters without seasonably forwarding them to MTI or Gary Tyler. The Former Employee Defendants and the NASB held the nonrenewal letters until all the Nebraska districts authorized the discontinuation of MTI's services. After all were received, Shepherd delivered the letters to the NASB, as instructed by Baril. MTI alleges that the NASB acted in furtherance of the conspiracy by forwarding the nonrenewal letters to MTI. Shepherd, Kiser and the NASB were directed in the alleged plan to defraud MTI by Baril, Lange, O'Hara, and/or other agents of SGS.

Defendant Baril resigned his employment with MTI effective April 20, 2005. He became formally employed by SGS no later than March 23, 2005, and had performed Medicaid reimbursement services for SGS, in competition with MTI, as early as October 12, 2004. Baril continues to be in a similar position and performing similar duties for SGS as he performed while employed by MTI.

In April 2005, Former Employee Defendants Kiser and Shepherd began negotiating their terms of employment with SGS. Baril, acting on behalf of SGS, advised Kiser and Shepherd that their requests for certain terms of employment would most likely be granted if they were successful in ensuring that the Nebraska districts' business was transferred to SGS.

-10-

No later than June 20, 2005, the NASB signed a new contract with SGS for its services as the Nebraska school districts' exclusive vendor for Medicaid reimbursement services as of July 1, 2005. On June 20, 2005, the NASB advised the districts, by mail, that the NASB would no longer be working with MTI and that it had chosen SGS as the new Medicaid reimbursement vendor. This letter was drafted and/or revised by defendant Baril at the direction and on behalf of SGS. It was sent to the districts during the period the NASB was contractually obligated to endorse and support MTI.

On July 5, 2005, long after the formation of the NASB Consortium, the NASB informed MTI by mail that over 172 school districts had appointed the NASB as their representative or agent and requested that MTI not engage in any further business contact with the individual school districts. SGS (acting through Baril, O'Hara and/or Lange) drafted the July 5 letter. On or about July 8, 2007, NASB mailed the notices of non-renewal to MTI. SGS, acting through Baril, O'Hara and/or Lange, drafted the July 8 letter.

On July 11, 2005, the NASB notified MTI by mail that the districts would not be renewing their contracts with MTI. Rather, the NASB Consortium would be seeking a new vendor. SGS, acting through Baril, O'Hara and/or Lange, allegedly drafted this letter. In a separate package sent on or about July 11, 2005, the NASB Consortium mailed to MTI the nonrenewal letters signed by the individual districts.

Defendants Kiser and Shepherd provided MTI notices of their resignations on July 15, 2005, and their resignations became effective July 29, 2005. Immediately after leaving MTI,

Kiser and Shepherd accepted positions with SGS and currently perform the same or similar duties they did while employed by MTI.  Both Kiser and Shepherd, allegedly, verbally accepted employment with SGS as early as July 8, 2005; however, in Kiser's resignation notice to MTI, she stated that she intended to pursue employment as a school principal.  MTI alleges that, at the direction of Baril and SGS, Kiser and Shepherd delayed submitting their resignations until after SGS had secured its contract with the NASB so that MTI would be left without any Nebraska employees and less able to complete its Nebraska contracts to the end of December 2005, or to recover any of its lost contracts with the Nebraska school districts.

After leaving MTI, the Former Employee Defendants refused to return MTI's equipment and proprietary information until they were compelled to do so "by threat or actual filing of legal action."  They did return their computers to MTI, but only after deleting information from the computers.

On July 11, August 8, and August 16, 2005 (and possibly other dates), the NASB, at the direction of Baril and SGS, demanded that MTI provide a transition plan explaining how MTI would perform its contractual obligations to the individual districts through December 2005.  The NASB, on behalf of SGS and at the direction of SGS, requested that MTI forfeit its rights under its existing contracts and allow SGS to begin performing such services for the fall quarter of the 2005 school year.

-12-

MTI refused to relinquish its contract rights to SGS for the rest of 2005. It alleges that the NASB, in response, wrongfully withheld $303,980 which was due and owing MTI from the individual districts. MTI sought on several occasions to collect these accounts; however, the NASB allegedly hindered these efforts by sending false information to the districts in furtherance of a strategy devised by the agents of the NASB and SGS to deceive the districts into believing that the NASB has a legal basis for holding the funds when it does not. Messrs. Baril, O'Hara and/or Lange assisted in drafting these communications. MTI is now placed in the position of choosing between collecting the $303,980 or initiating litigation against the individual districts, the clients it would like to solicit and contract with in the future. MTI thus alleges that the NASB is engaged in an ongoing conspiracy with the other defendants to defraud MTI by using the NASB Consortium to withhold money due to MTI from the individual school districts, and to discourage the districts from complying with their contractual obligations to MTI for services performed by MTI in 2005.

In December 2005, MTI offered the Nebraska school districts a new contract for Medicaid reimbursement services at a substantial savings to the districts, and more advantageous than the terms the districts were receiving as part of the NASB Consortium under the SGS contract. On December 9, 2005 defendant Baril, on behalf of the NASB and SGS, informed the districts by e-mail that if they decided to contract with MTI they would be required to resign from the NASB Consortium. Baril's communication implied that the

districts would not receive the benefits of their NASB memberships if they chose a vendor other than SGS.

On December 9, 2005, John Bonaiuto informed the districts by mail that the NASB was the official negotiator of all contracts concerning the NASB Consortium or Medicaid reimbursement program administration.  This communication allegedly misinformed the districts by implying that if they chose to contract with MTI, then the NASB would no longer have a voice for those districts with State officials, and by implying that MTI did not concur in the NASB's "long term" desire to provide members with the most cost effective benefits and the most knowledgeable staff.  MTI contends that Baril assisted in drafting this letter and that the  letter was an improper attempt to interfere with MTI's attempts to regain its business in Nebraska.

On January 3, 2006 the NASB once again notified the school districts that any district that contracted with MTI would be required to terminate its membership in the NASB Consortium.  Defendant Baril allegedly assisted in preparing this communication at the direction and on behalf of SGS.

Finally, after expropriating MTI's business in Wisconsin, Illinois and Nebraska, SGS offered to purchase MTI's business at a substantial reduction from the previous value of the company. Offers were made on November 26, 2006 and February 1, 2007.  MTI alleges that SGS's offers demonstrate a broad scheme by Lange, O'Hara and Baril to defraud MTI from its business in states such as Nebraska in order to diminish the value of MTI's remaining

business.  This scheme was designed to allow SGS to assume all of MTI's business by paying as little as possible for the business SGS could not siphon away through improper means.

## II. LEGAL ANALYSIS

### A.  Pleading Standards

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a pleading "shall be freely given when justice so requires."  The court may refuse to grant leave to amend a pleading "only where it will result in 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'"  *Dennis v. Dillard Dept. Stores, Inc.*, 207 F.3d 523, 525 (8th Cir. 2000) (quoting *Foman v. Davis*, 371 U.S. 178 (1962)).  Delay alone is insufficient to deny a motion for leave to amend, and the party opposing the motion must show it will be unfairly prejudiced.  *Id.*[3]

As Judge Smith Camp previously observed,

> "To have standing to make a RICO claim, a party must have 1) sustained an injury to business or property 2) that was caused by a RICO violation." *Asa-Brandt, Inc. v. ADM Investor Services, Inc.*, 344 F.3d 738, 752 (8th Cir. 2003), citing *Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 951 (8th Cir. 1999).  "Then a RICO plaintiff must prove the defendant 'engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity,'" *Id.*, quoting *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir. 1997).

---

[3]The defendants also object to the proposed amendment as untimely.  MTI was previously granted an extended deadline due to the failure or refusal of some, if not all, defendants to timely provide discovery.  MTI's motion was filed within the deadline.  The defendants' objections based on timeliness are overruled.

Filing 64 at p.4 (*Meccatech, Inc. v. Kiser*, 2006 WL 1572591 at *2 (D. Neb., June 7, 2006)).

Since the proposed RICO claims are based on allegations of mail fraud and wire fraud, MTI must also meet the heightened pleading requirement of Fed. R. Civ. P. 9(b), which provides: "In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." *See, e.g., Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1069 (8th Cir. 1995). The requirements of Rule 9(b), however, must be interpreted "'in harmony with the principles of notice pleading.'" *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001).

> The special nature of fraud does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct. Thus, a plaintiff must specifically allege the "circumstances constituting fraud," Fed. R. Civ. P. 9(b), including "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982), *adhered to on reh'g*, 710 F.2d 1361 (8th Cir.) (en banc), *cert. denied*, 464 U.S. 1008 (1983); *see also Murr Plumbing, Inc.* [*v. Scherer Bros. Fin.*, 48 F.3d 1066, 1069 (8th Cir. 1995)].

*Id.* (parallel citation omitted). "The level of particularity required depends on, *inter alia*, the nature of the case and the relationship between the parties..... 'Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule.'" *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908 (8th Cir. 2007) (citations omitted).

Finally, the Rule 9(b) heightened pleading standard applies only to the incidents of wire fraud or mail fraud alleged to be acts of racketeering, and not to whether the alleged acts

form a "pattern."  *See Abels v. Farmers Commodities Corp.*, 259 F.3d at 919 ("If the racketeering activity alleged were bribery, for example, Rule 9(b) would not apply, but a court ruling on a motion to dismiss would still have to determine whether there were any facts the plaintiffs could prove that would connect the acts of bribery into a pattern.")

Basically, MTI contends its proposed amended complaint cures the deficits identified in Judge Smith Camp's prior orders.  The defendants contend otherwise.

### B.  RICO Elements

The court finds that MTI's amended complaint sufficiently demonstrates that it sustained an injury to its business or property as the result of actions taken by the defendants. The issue presented to the court is whether MTI's allegations are sufficient to allege that MTI's injury was caused by any RICO violation committed by the defendants by engaging in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.

### 1.  Conduct

In *Reves v. Ernst & Young*, 507 U.S. 170 (1993), the Supreme Court addressed the narrow question of the meaning of the phrase "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs."  The majority of the Court concluded that, considered as both a noun and a verb, the term "conduct" required "an element of direction," 507 U.S. at 178, and the word "participate" required "some part in that direction."  *Id.* at 179. Accordingly, "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs."  *Id.*  The use of the

word "participate" "makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required." *Id*. (footnote omitted).

One is not liable under § 1962(c) unless one has participated in the operation or management of the enterprise itself. *Id*. at 183. Significantly, "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Id*. at 184. The Court held that "'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. at 185. This is, essentially, the test previously established by the Eighth Circuit in *Bennett v. Berg*, 710 F.2d 1361, 1364 (en banc), *cert. denied*, 464 U.S. 1008 (1983).

Under *Reves*, MTI is not required to allege that each defendant was a manager or high level employee. MTI explains in great detail how each defendant actively participated in a scheme to divert MTI's Nebraska business to its competitor, SGS. The predicate acts of mail fraud and wire fraud "consist in the foreseeable use of the mails or wires for the purpose of carrying out a scheme to defraud.... Beyond that, the offense conduct may vary rather widely." *Abels v. Farmers Commodities Corp.*, 259 F.3d at 918. The fraudulent aspect of

-18-

mail fraud "is measured by a non-technical standard, condemning conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play." *Id*. A plaintiff need not allege that a defendant made misrepresentations of fact, and no misrepresentations need be transmitted by mail or wire. Even routine business communications in these media may suffice to make a scheme of false dealing into a federal offense. *Id*. *See also Handeen v. Lemaire*, 112 F.3d 1339, 1347-48 (8th Cir. 1997).

The proposed complaint describes in detail the circumstances surrounding the mail and wire communications disseminated by the defendants in furtherance of their allegedly fraudulent objectives. The court finds that MTI's allegations sufficiently identify the "who, what, where, when, and how" of the alleged mail and wire fraud as required by Fed. R. Civ. P. 9(b), *see BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d at 917, and are sufficient to state a RICO claim under § 1962(c).

## 2. Enterprise

Pursuant to 18 U.S.C. § 1961(4), a RICO "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

> The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute.... The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may

in particular cases coalesce, proof of one does not necessarily establish the other.  The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages.

*United States v. Turkette*, 452 U.S. 576, 583 (1981).

In light of the decision in *Turkette*, the Eighth Circuit has identified "three characteristics possessed by all RICO enterprises: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering."  *Handeen v. Lemaire*, 112 F.3d 1339, 1351 (8th Cir. 1997) (citing *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995 (8th Cir. 1989)).

MTI identifies the alleged RICO "enterprise" as the defendants' collaboration in a scheme to defraud MTI.

### Common or Shared Purpose

Although the enterprise itself must be marked by a common purpose, "it is not necessary that every single person who associates with the entity gain some discrete advantage as a result of that particular motivation."  *Handeen v. Lemaire*, 112 F.3d at 1351. The court finds that MTI's allegations satisfactorily demonstrate that the individually-named defendants and the agents of SGS and NASB shared the common goals of diverting Medicaid reimbursement services contracts from MTI to SGS and otherwise promoting the interests of SGS at the expense of MTI in Nebraska and elsewhere.

### Continuity of Structure and Personnel

Continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs

-20-

> on a continuing, rather than an ad hoc, basis.  The continuity-of-personnel element involves a closely related inquiry, in which the determinative factor is whether the associational ties of those charged with a RICO violation amount to an organizational pattern or system of authority.  The continuity of these elements need not be absolute....  [B]oth the structure and the personnel of an enterprise may undergo alteration without loss of the enterprise's identity as an enterprise.

*Handeen v. Lemaire*, 112 F.3d at 1351 (quoting  *United States v. Kragness*, 830 F.2d 842, 856 (8th Cir.1987)).

Here, the proposed amended complaint depicts an association between Joseph O'Hara, the former President of SGS and MTI's former President, Gary Lange, beginning in 2002 or 2003.  Lange left MTI and became associated with O'Hara and SGS after the EPISD negotiations.  Baril, who was also involved in the EPISD negotiations, remained employed by MTI but allegedly secretly performed work for SGS on the side, at the request or direction of O'Hara and/or Lange.  Meanwhile, Lange and Baril maintained their contacts with John Bonaiuto and the NASB and, in collaboration with O'Hara and SGS, assisted the NASB in organizing and populating the NASB Consortium for the purpose of diverting the member school districts' contracts for Medicaid reimbursement from MTI to Harris' company, SGS.  They were assisted in doing so by defendants Kiser and Shepherd, who acted at Baril's direction and were allegedly awarded favorable terms of employment with SGS after the NASB Consortium entered into its contract with SGS in June 2005.

The court finds that the "continuity" element has been met.

-21-

### 3. Pattern of Racketeering Activity

Under 18 U.S.C. § 1961(5) a "pattern of racketeering activity" requires "at least two

acts of racketeering activity ... and the last of which occurred within ten years (excluding any

period of imprisonment) after the commission of a prior act of racketeering activity."

"[A] pattern of racketeering activity is present only when predicate acts are linked by

"continuity plus relationship."" *Handeen v. Lemaire*, 112 F.3d at 1353 (quoting *H.J., Inc. v.*

*Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989), with emphasis omitted).

> Continuity is more of an abstraction, but the Court has referred to it as "both
> a closed- and open-ended concept," [*H.J., Inc. v. Northwestern Bell Tel. Co.*,
> 492 U.S. at 241], which is principally temporal in nature. "A party alleging a
> RICO violation may demonstrate continuity over a closed period by proving
> a series of related predicates extending over a substantial period of time." *Id.*
> at 242. Failure to shoulder this burden is not an insuperable bar to relief,
> however, because even if the acts do not span the years necessary to establish
> closed-ended continuity ... the predicates will meet the definition of
> open-ended continuity to the extent they "involve a distinct *threat* of long-term
> racketeering activity," *H.J.*, 492 U.S. at 242 (emphasis added). "The
> determination of a pattern of racketeering activity is a factual determination."
> *Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank*, 934 F.2d 976, 980 (8th
> Cir. 1991).

*Handeen v. Lemaire*, 112 F.3d at 1353.

In this case, it is alleged that the plan to siphon away MTI's business to the benefit of

SGS was conceived around the time of the EPISD negotiations in 2003-2004. SGS, through

its agents, allegedly interfered with MTI's business interests in other states. MTI has

specified numerous instances beginning in February 2004 (when Gary Lange began working

with O'Hara and SGS in violation of his non-compete agreement with MTI) in which the

NASB, SGS and the individual defendants began working together to defraud MTI. Significant discovery was accomplished between the filing of the original complaint and plaintiff's motion to amend. The amended allegations are based largely on information produced by the defendants during discovery.[4] MTI has demonstrated that the defendants' activities continue through today, as demonstrated by the withholding of accounts due by the NASB and SGS's offer to purchase MTI's business at a low price after strategically decimating MTI's personnel and client base. Defendants repeatedly used the mails and the wires to accomplish these objectives and, allegedly, continue to do so.

Considering the facts alleged, the court finds that the alleged predicate acts of mail and wire fraud will meet the definition of open-ended continuity, as they involve a distinct threat of long-term racketeering activity. In other words, it is likely that the mails and wires will continue to be used in furtherance of this particular enterprise. The alleged predicate acts are related, as they had the same purposes (enhancing the business of SGS at the expense of MTI), results (SGS succeeded in pilfering MTI's employees and clients in various locations), participants (the named defendants, together with O'Hara and Lange), and victim (MTI).

---

[4] The phrase, "upon information and belief" appears throughout the proposed amended complaint. Where allegations of fraud are based "only" on information and belief, the complaint must set forth the source of the information and the reasons for the belief. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 (8th Cir. 1997). Having considered all parties' arguments and evidentiary submissions, the court believes MTI has satisfied this requirement.

### C.  Liability as Conspirators

The liability of SGS and the NASB under RICO, § 1962(d), is premised on their status as  conspirators.  They argue that the proposed amendments are futile because there is no evidence that there was any "conspiracy" actionable under RICO.

Civil conspiracy is not an independent tort, but is dependent upon the existence of an underlying tort.  *Brummels v. Tomasek*, 273 Neb. 573, 582, 731 N.W.2d 585, 593 (2007). A claim for civil conspiracy serves as a mechanism for subjecting co-conspirators to liability when one of their members commits a tortious act.  *See Beck v. Prupis*, 529 U.S. 494, 503 (2000).  Thus, a civil conspiracy plaintiff must claim injury from an act of a tortious character.  *Id*. at 504.

"A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means."  *Four R Cattle Co. v. Mullins*, 253 Neb. 133, 140, 570 N.W.2d 813, 818 (1997).  Civil conspiracy may be proved by a number of indefinite acts, conditions and circumstances which vary according to the purpose to be accomplished; however, the plaintiff must prove the existence of at least an implied agreement to establish conspiracy. *Id*.  "Procuring breach of a contract is an unlawful act subject to civil suit ... and a conspiracy to cause breach of contract is actionable."  *Falstaff Brewing Corp. v. Iowa Fruit & Produce Co.*, 112 F.2d 101, 108 (8th Cir. 1940) (applying Iowa law) (defendant's hiring away

plaintiff's salesmen found to be "a malicious attempt to ruin the beer business of plaintiff and as such is actionable").

The proposed amended complaint alleges that the NASB, through its officers or agents, participated in numerous conference telephone calls with SGS to discuss the creation of the NASB Consortium for the purpose of diverting MTI's business to SGS, all during the time NASB was under a contractual duty to support and promote MTI to its member school districts.

As discussed above, the court finds that the amended complaint is sufficient to state a RICO claim pursuant to § 1962(c) against the Former Employee Defendants.

> When a plaintiff has already established a right to relief under § 1962(c), he may show a conspiracy to violate RICO simply by presenting additional evidence that the defendant entered into an agreement to breach the statute.... [A] plaintiff "need only establish a tacit understanding between the parties, and this may be shown wholly through the circumstantial evidence of [each defendant's] actions."

*Handeen v. Lemaire*, 112 F.3d at 1354-55 (citations omitted).  MTI's allegations against SGS and the NASB satisfy this standard.

### III.  CONCLUSION

In summary, the court finds that the defendants' objections based on delay should be denied, the proposed amendments are not futile, MTI has satisfied the requirements of Fed. R. Civ. P. 9(b) as to its allegations of fraud, and the complaint is sufficient to state a claim under RICO.

Pursuant to Fed. R. Civ. P. 15(a),

-25-

**IT IS ORDERED:**

1.   Plaintiff's Motion for leave to file a First Amended Complaint [199] is granted. Plaintiff shall file and serve the First Amended Complaint on or before October 30, 2007, unless the district court orders otherwise.

2.   Pursuant to NECivR 72.2, a party may appeal this order by filing an **"Appeal of Magistrate Judge's Order"** within ten (10) days after being served with the order. The party shall specifically state the order or portion thereof appealed from and the basis of the appeal. The appealing party shall file contemporaneously with the statement of appeal a brief setting forth the party's arguments that the magistrate judge's order is clearly erroneous or contrary to law.  The filing of a statement of appeal does not automatically stay the magistrate judge's order pending appeal.  *See* NECivR 72.2(d).

**DATED October 22, 2007.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**