## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MECCATECH, INC., | ) | CASE NO. 8:05CV570 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM AND ORDER |
| vs. | ) | ON PLAINTIFF'S MOTION FOR |
| | ) | PRELIMINARY INJUNCTION |
| CLAUDIA KISER, SARAH SHEPHERD, | ) | |
| PAT BARIL, STRATEGIC | ) | |
| GOVERNMENTAL SOLUTIONS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on Plaintiff MeccaTech, Inc.'s ("MTI") Motion for Preliminary Injunction (Filing No. 379). On April 1, 2008, the Court entered a temporary restraining order enjoining Strategic Governmental Solutions, Inc., ("SGS") and Educational Services & Products, LLC., ("ESP LLC"), their officers, agents, servants, employees, attorneys and any other person in active concert or participation therewith, including, but not limited to Joseph O'Hara, Gary Lange, Derek Abraham, and Michael Martin ("ESP LLC Partners"), from transferring funds, assets or other property of SGS or ESP LLC, outside the ordinary course of business, including any assets SGS or ESP LLC may obtain in the future.[1]

---

[1] On April 8, 2008, the Court granted MTI leave to file an amended complaint to add defendants, including Joseph O'Hara, Gary Lange, and ESP LLC. Federal Rule of Civil Procedure 65(d)(2)(C) permits the Court to enjoin those who are in active concert or participation with parties and parties' officers, agents, servants, employees, and attorneys. Fed. R. Civ. P. 65(d)(2)(C). I find that O'Hara, Lange, Abraham, and Martin are subject to this Rule. Additionally, I find that they have had ample notice of the Preliminary Injunction hearing, and this lawsuit.

The Court set a hearing on the Motion for Preliminary Injunction for Tuesday, April 8, 2008, at 10:00 a.m., and set an evidentiary hearing on Plaintiff's Motion for Default Judgment for the same time.  (Filing Nos. 375 and 403).  On Monday, April 7, 2008, the Court received notice that SGS, and only SGS, filed for Chapter 7 Bankruptcy in the Northern District of New York.  On Tuesday, April 8, 2008, as a result of the Bankruptcy Petition, the Court declined to hear testimony on the Motion for Default Judgment.  The Court did hear arguments regarding to what extent the automatic stay provided in 11 U.S.C. § 362 applies to the Plaintiff's Motion for Preliminary Injunction.  Based on the filings in this matter, and on arguments presented by counsel, the Court makes the following findings.

**FACTUAL BACKGROUND**

MTI is a Michigan company that assists school districts across the country to recover money through Medicaid reimbursements.  Defendant SGS is a competitor of MTI. From 1999 through 2005, MTI contracted with approximately 180 Nebraska school districts to file Medicaid reimbursement claims on the districts' behalf for services provided to eligible students.  Defendants Kiser, Shepherd, and Baril (together, the "Former Employee Defendants") were employed by MTI, and participated in a scheme to divert MTI's Nebraska business to SGS, where they accepted employment and where they continue to perform the same duties they performed at MTI.

Gary Lange is the former president of MTI, who resigned from MTI in February 2004.  (Filing No. 227, Amended Complaint, ¶ 10).  Approximately 15 months before he resigned, Lange entered into an employment agreement with MTI. This employment agreement prohibited Lange from (1) directly or indirectly soliciting or selling any of MTI's

2

products or services or similar products or services to any of MTI's customers, and (2) directly or indirectly marketing or selling any of MTI's products or services or similar products or services to any of MTI's customers, for a 12-month period following his resignation from MTI. (*Id.* ¶ 11).

Despite his non-compete agreement, immediately after he left MTI, Lange began working for Joseph O'Hara, the sole owner of SGS, a competitor of MTI. (Filing No. 48, Gary Tyler Aff. at Ex. A; *see* Filing No. 381-14, O'Hara Depo. 29:22-30:7, 13-18). O'Hara and Lange attempted to hide Lange's involvement with SGS, and Lange's competitive actions, by employing Lange through The O'Hara Group & Associates, LLC ("TOGA"), a lobbying and consulting company owned and managed by O'Hara to market products and services on behalf of SGS. (Amended Complaint ¶ ¶ 28-30; *see* Filing No. 407-4, O'Hara depo. 59:25).

In 2004, Lange and O'Hara conducted regular, weekly meetings, either by telephone or in person, to discuss the progress and direction of the enterprise that they had formed and to discuss the actions and instructions that should be given to others within the enterprise. (Filing No. 304-6, p.3, email regarding weekly senior staff meetings of SGS). During this time, Lange recruited a number of MTI employees to join SGS in an attempt to siphon away MTI's business in various states. (Filing No. 323-5, Tyler Aff. ¶¶ 11 and 12). One of these employees was Pat Baril, MTI's Nebraska State Director.[2]

---

[2] While Baril was employed by MTI, he traveled to El Paso on behalf of SGS, received secret expense reimbursements from SGS, and performed Medicaid Reimbursement Services for SGS. (Filing No. 258-9, Baril Depo. 42:3-24).

By June 2004, Lange, O'Hara and Baril were actively working to divert MTI's Nebraska business to SGS.[3]   In June 2004, Baril sent to O'Hara budget information regarding the Nebraska school district accounts (Filing No. 258-2, p. 8, email from Baril to O'Hara).  Also in June 2004,  Lange, O'Hara and Baril drafted a letter to be used by the individual school districts and directed to MTI indicating the school districts' intention to not renew their contracts with MTI.  (Filing No. 258-2, p. 6-7).  Lange, O'Hara and Baril agreed that the letter should be addressed to Lange, the former president of MTI, and O'Hara's employee.[4]  Throughout this time, Lange, O'Hara, and Baril took steps to ensure that MTI would not discover their actions.  In July 2004, Lange sent an email to Baril reminding Baril to "make sure all emails are on a platform that MTI does not have access to."  (Filing No. 304-10, p. 44).[5]

By August 19, 2004, Baril, Lange and O'Hara had created and delivered to the Nebraska Association of School Boards ("NASB") a Letter Agreement outlining the terms of a proposed contract between SGS and NASB for SGS to provide Medicaid

---

[3]  In a June 2004 email, Baril stated that he thought the relationship among O'Hara, Lange and himself would be "great and profitable."  In the same email, Baril also sought instructions regarding which activities should be coordinated through O'Hara and which through Lange.  (Filing No. 258-2, p. 10, email from Baril to Lange and O'Hara.)

[4]  Specifically, Lange, O'Hara and Baril took steps to ensure that MTI's new president, Gary Tyler, would not be alerted to their actions.  "Did you see my comment re: contracts indicate Gary Lange as MTI contact?  How would they know to send it to Tyler?  No sense in their getting the right addressee from you." (Filing No. 258-2, p.6, June 29, 2004 email from SGS to Baril).

[5]  Lange also drafted and sent, with O'Hara's approval, an email regarding the Wisconsin accounts to "put [Tyler] to sleep for a while longer."  (Filing No. 304-6, p. 22, August 7, 2004, email from Lange to O'Hara).

4

Reimbursement Services to the school districts beginning in 2004.[6]   (Filing No. 304-6, p. 38, August 20, 2004, email forwarded to Lange from Baril, originally sent by Dan Kosmicki of the NASB).[7]   O'Hara stated in an August 8, 2004, email to Baril, "Please let me know if there's anything else we can do to encourage the NASB to hook up with us." (Filing No. 258-2, p.9).  In August 2004, Lange, O'Hara and Baril drafted and revised a Letter of Agreement ("LEA") to create the NASB Medicaid Reimbursement Consortium.  School districts that signed the LEA agreed to participate in the NASB Consortium and to appoint the Consortium as their agent to receive Medicaid Reimbursement payments, to make payments to third-party administrators such as MTI or SGS, and to execute contracts on their behalf.  (Filing No. 304-6, pg. 12-13, August 6, 2004, email from SGS to Baril with draft letters).  Until this time, each school district contracted with MTI individually.  NASB delivered the LEA agreements to the school districts by mail, and Baril helped NASB gather and track the LEAs the school districts had signed.

Even though he had been working behind the scenes for SGS for almost one year, Baril officially gave MTI two weeks' notice of his resignation on April 6, 2005, and began employment with SGS, at the latest, on April 21, 2005.  (Filing No. 26, Baril Aff. ¶ 8). Before giving his notice of resignation to MTI, Baril actively recruited other MTI employees to work for SGS.  (Filing No. 39, Smith Aff. Ex A). An April 3, 2005, e-mail includes Baril's

---

[6]  The NASB was originally named as a Defendant in this matter.  It was dismissed in February 2007 pursuant to a settlement between it and MTI.  (Filing No. 345, Stipulation of Dismissal with Prejudice).

[7]  While the first letter was sent by SGS in 2004, it appears that NASB actually signed an agreement with SGS June or July of 2005.  (Filing No. 381-13, Letter Agreement).

response to a question by Kiser related to the difference in the cost of health insurance premiums paid by MTI and SGS employees, and the question of whether Kiser's salary could be increased to compensate for that difference. The e-mail also includes Baril's statement that: "if we get all the schools to transfer over this most definitely will not be a problem . . . " (*Id.*, *see also* Filing No. 44, Baril Supp. Aff. ¶3).

Even though Baril, Shepherd and Kiser were employees of MTI when the NASB Consortium was formed, none of them notified, consulted with, or received authority from MTI to develop the NASB Consortium.   (Filing No. 305-5, Shepherd Depo. 124:1-23; 127:7-128:18).  From at least May 1, 2005, through mid-July 2005, Baril, Shepherd, and Kiser were collecting correspondence from the school districts that expressed the districts' intention not to renew their contracts with MTI.  E-mails between Baril, Kiser, and Shepherd dated May 9, 2005, show that they were keeping track of the districts that had sent non-renewal notices to them and those that had not. (Filing No. 39, Smith Aff. at Exs. B and C).  Despite a contractual requirement that such "non-renewal letters" be sent directly to Gary Tyler, MTI's president, Baril directed the school districts to use a form letter he prepared with a mailing address that was either Baril's address or MTI's Omaha address.[8] Thus, many of the letters were mailed directly to Baril, who was then employed at SGS, and others were mailed to Shepherd at MTI's Omaha address.  Shepherd did not inform her superiors at MTI that she had received non-renewal letters during this time.  (Filing No. 305-5, Shepherd Depo. 124:1-23; 127:7-128:18; Filing No. 39, Tyler Aff. ¶ 8, 12).  In fact, Tyler had knowledge of only a single non-renewal letter that was mailed directly to him,

---

[8] The record is not clear if the 2005 letters were addressed to the attention of Tyler or Lange.

6

until he received a packet from John Bonaiuto, Executive Director of the NASB, containing 175 non-renewal letters on July 11, 2005. (Filing No. 5, Tyler Aff. at ¶¶ 12, 14-18; see Filing No. 39, Bonaiuto Aff. ¶11).

Although NASB decided not to renew its contract with MTI as early as March 2005, NASB notified MTI that NASB was terminating its royalty agreement with MTI in correspondence dated May 24, 2005 (drafted by O'Hara, Lange and/or Baril). (Filing Nos. 252-7 and 304-6, p. 12-13.) Under that royalty agreement, NASB had been paid a percentage of MTI's fee for the services it provided to the Districts. (Filing No. 5, Tyler Aff. ¶ 13). Tyler contacted Bonaiuto immediately to investigate the termination, and Bonaiuto told Tyler that NASB was looking at all contracts that had an automatic renewal provision, and that the notice did not signal any problem with MTI nor a change in course. (*Id.*).

On June 20, 2005, NASB's Board of Directors authorized NASB, on behalf of the Consortium, to contract with Educational Systems & Products, a division of SGS, for Medicaid reimbursement services.[9] (Filing No. 28, Bonaiuto Aff. at ¶ 27). On July 1, 2005, the first day that a new contract for reimbursement could be executed by NASB, a Letter-of-Agreement was executed by Bonaiuto, on behalf of the NASB Consortium, with ESP (Filing No. 28, Bonaiuto Aff. ¶¶ 27-28). Even though the Letter-of-Agreement with ESP had already been executed, Bonaiuto informed MTI on July 5, 2005, that the school districts had authorized NASB to serve as their agent for the Medicaid reimbursement program. (Filing No. 252-8) Purportedly acting as the districts' agent, on or about July 11, 2005, NASB advised MTI by a letter drafted by Baril, O'Hara and/or Lange that (a) the

---

[9] During this time, Educational Systems & Products was a doing business as SGS and not as a separate corporation. (Filing No. 304-6, p. 31).

7

districts would not be renewing their contracts with MTI and (b) the NASB Consortium would be seeking a new vendor as the agent of the districts. (Filing No. 252-10). In a separate package that was sent on or about the same date as the July 11, 2005, letter, the NASB Consortium mailed to MTI the Nonrenewal Letters signed by the Districts. (Filing No. 252-9). When Tyler spoke to Bonaiuto on July 11, 2005, Bonaiuto informed Tyler that the NASB had decided to contract with a different vendor for Medicaid reimbursement services. (Filing No. 39, Tyler Aff. ¶ 11).

On July 18, 2005, Shepherd and Kiser gave MTI notice of their resignations, and their employment was terminated effective July 29, 2005. (Complaint ¶¶ 34, 35). In an e-mail dated August 7, 2005, Baril wrote to the Consortium's members, stating "if any third party vendor asks you to sign a new contract, or renew a current NEBMAC contract [for Medicaid reimbursement], please inform them that you are a member of and have a contract with the NASB Consortium. Please refer them on to John Bonaiuto of NASB who is in charge of all contracts and your NASB Consortium." (Filing No. 39, Smith Aff. Ex. E).

MTI alleges that these events were part of ongoing enterprise and pattern of racketeering activity undertaken by SGS, O'Hara and Lange, whereby they improperly endeavored by illegal means to drive down the value of MTI for the purposes of either obtaining its business or purchasing it at a bargain price. After siphoning away business from MTI in states such as Wisconsin, Illinois and Nebraska through the course of conduct and the conspiracy described above, on November 26, 2006, and then again on February 1, 2007, SGS offered to purchase MTI's remaining business at a substantial reduction from the value of the company before the commencement of the enterprise and pattern of racketeering activity. (Filing Nos. 325-5, pp. 45-47 and 48-50).

8

On December 29, 2005, MTI initiated this action to recover damages based on a number of business torts allegedly committed by the Defendants. (Filing No. 1). In the fall of 2007, after extensive discovery, the Defendants continued to hide information from MTI to conceal their actions. In particular, Lange and O'Hara withheld relevant documents and were not truthful during their depositions. The full extent of the parties' discovery abuses are outlined in the Magistrate Judge's Report and Recommendation of April 2, 2008. [10]

On March 18, 2008, NASB filed an Interpleader Action with the Court (*Nebraska Association of School Boards, Inc. v. Strategic Governmental Solutions, Inc. et al.*, Case No. 4:08-cv-3052 (D. Neb. 2008) "Interpleader Action"). Attached to the NASB Interpleader Amended Complaint was a document the NASB received from ESP LLC indicating that on or about July 13, 2007, to be effective as of July 1, 2007, SGS purportedly transferred "all of its existing and/or future assets" to ESP LLC. (Filing No. 381-5, p. 3 "Transfer Agreement"). SGS did not previously disclose this transfer to the Court. MTI contends that SGS actively concealed the transfer of its assets to ESP LLC, and engaged in serial perjury and other improper acts and omissions to prevent discovery of its fraudulent

---

[10] One example of the continued discovery abuses by Defendants concerns the production of documents. MTI served a subpoena on Lange requesting documents, including emails related to this matter. (Filing No. 281-3). Lange testified that he had no documents because his computer hard drive had been replaced. (Filing No. 281-8, Lange Depo. 18:25-20:6). However, according the Aaron Lum, the computer consultant who replaced the hard drive, he transferred all the data from the old hard drive to the new one. (Filing No. 258-4, Lum Aff. ¶ 5). Lum, who retained the hard drive, provided it to MTI. (Id. ¶¶ 6, 7). The hard drive included numerous emails, letters and other documents that showed the conspiracy began more than one year before Baril, Lange, and O'Hara acknowledged. Further, these documents show the broad extent of the actions taken by Baril, Lange and O'Hara to keep MTI from discovering their conspiracy. (The documents retrieved from the hard drive, but not previously produced are found at Filing No. 258-2, Affidavit of Larry Dalman and Supp. Dalman Aff. Filing No. 304-2 through 304-11).

transfer.  The terms of the transfer are unusually vague; it appears that all the assets of SGS were transferred to ESP LLC, but few of SGS's liabilities; and ESP LLC is a closely related company headed by O'Hara and his son, Derek Abraham.  (*Id.*)  As part of the interpleader action, Fifth Third Bank, a creditor of ESP LLC and SGS, has filed a Motion to Intervene.  The loan documentation in support of that Motion shows that the partners of ESP LLC are O'Hara, Abraham, Lange and Martin.  (Filing No. 381-10, p.3).

In support of its request for an injunction to prevent the transfer of ESP LLC's assets, MTI points to SGS's responses to a request for documents, dated  September 10, 2007, in which SGS's counsel provided MTI with a number of financial records. Included among them were documents entitled "Strategic Governmental Solutions, Inc. Nebraska Project Profit & Loss Statement January 2005 through July 2007."  The Profit and Loss Statement details numerous expenses which SGS paid during the month of July 2007 and has a footer at the bottom of the document suggesting it was created on August 30, 2007. (Filing No. 381-3).

MTI also references repeated testimony by the Former Employee Defendants evidencing that SGS continued to retain them as employees after the alleged July 2007 transfer.  (Filing No. 381-17, Kiser Depo. 133:19-21 and Filing No. 381-19, Shepherd Depo. 66:1-6; 250:2-9).  Further, O'Hara's deposition testimony repeatedly contradicts the Transfer Agreement and its terms.   O'Hara testified that in August 2007, a month after the alleged transfer of all its assets, SGS had 30 employees.   O'Hara also testified that he stepped down as President of SGS in March 2007, although he signed the Transfer Agreement as the "President, Chief Executive Officer and Sole Shareholder" of SGS in July 2007.  (Filing No. 381-5, p. 3).  In August 2007, O'Hara testified that there were no

10

companies other than SGS that worked with the Medicaid related matters; that "ESP" was only a division of SGS; and that the financial numbers discussed in the deposition included "ESP" as a division of SGS.  (Filing No. 381-14, O'Hara Depo. 37:4-11, 44:25-45:9, 53:2-14, 73:4-20, 152:23-153:16).

In the Bankruptcy Filing, SGS indicates it has used the name Educational Systems & Products, as a division of SGS.  It appears that SGS considers this "division" of SGS different from ESP LLC, as ESP LLC is listed as an unsecured creditor.  *In re Strategic Governmental Solutions, Inc.*, Case No. 08-11047-1-rel (N.D.N.Y. April 7, 2008)  (Filing No.1, "Bankruptcy Petition," Schedule F, p. 3).  ESP LLC has filed a Notice of Appearance and Request for Notice in the Bankruptcy Case. (*Id.*, Filing No. 6).   The first meeting of creditors in the Bankruptcy Action is scheduled for May 16, 2008.  ( *Id.* at Filing No. 4.)

At the hearing on April 8, 2008, the Court granted MTI leave to amend its complaint to add defendants including, ESP LLC, O'Hara and Lange.  Therefore, in determining whether to enjoin ESP LLC, O'Hara, Lange and the other partners of ESP LLC, the Court will look to standards for a prevailing party under RICO, and under Nebraska's law of tortious interference with contractual relations.

## DISCUSSION

**PRELIMINARY INJUNCTION**

In determining whether a preliminary injunction should issue, the Court is required to consider the factors set forth in *Dataphase Systems, Inc. v. C.L. Sys. Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc).  A district court should weigh "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that

11

granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Id.*

The burden of establishing the necessity of a preliminary injunction is on the movant. *Baker v. Electric Co-op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir.1994). "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker*, 28 F.3d at 1472 (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs, Inc.,* 815 F .2d 500, 503 (8th Cir.1987)).

*Irreparable Harm*

The first *Dataphase* factor the Court must consider is the degree of irreparable harm MTI will suffer if the Court does not grant injunctive relief. *See Dataphase*, 640 F.2d at 114. The moving party may show irreparable harm by demonstrating that it has no adequate remedy at law. *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994); *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir. 1992).

The United States Supreme Court has determined that an injunction is reasonable to preserve the status quo pending determination of a lawsuit when the Defendant is insolvent and its assets are in danger of dissipation or depletion. *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940). The Bankruptcy Petition alleges that SGS is insolvent, and that while ESP LLC is purportedly a creditor of SGS, the Court has every reason to conclude that ESP LLC is an alter ego of SGS and that O'Hara and Lange will not preserve ESP LLC's assets. The Defendants' financial status is such that the legal remedy, without the issuance of an injunction, would be inadequate. *Id.* A preliminary

12

injunction is proper to ensure the preservation of an adequate remedy. *Airlines Reporting Corp. v. Barry,* 825 F.2d 1220, 1227 (8th Cir. 1987).

In this case, MTI is requesting that the Court maintain the status quo to prevent ESP LLC from dissipating assets and funds outside the ordinary course of business or distributing such assets to partners of the LLC.  MTI has provided ample evidence that O'Hara and Lange have systematically attempted to delay this litigation and hide assets, including the transfer of SGS's assets, such as the transfer of SGS's contract with the NASB to ESP LLC.  Consequently, without this injunction, MTI's legal remedy will be inadequate.  I find that this factor weighs heavily in favor of MTI.

<u>Balance of the Harm</u>

Next, the Court considers "the balance between the harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties."  *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir. 1994). While "irreparable harm" focuses on the harm or potential harm to the plaintiff, the "balance of harm" analysis examines the harm of granting or denying the injunction upon all parties to the dispute and upon other interested parties, including the public. *Dataphase*, 640 F.2d at 114; *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 372 (8th Cir. 1991) (balancing the irreparable harm to the movant and the harm that a preliminary injunction would cause to other parties and the public interest).  In this case, the Court is permitting ESP LLC to continue its business; it is only prohibited from acts that can be construed as "outside the ordinary course of business" or transfers to one of the interested parties.  An injunction will prevent O'Hara and Lange from attempting another transfer of assets to prevent MTI's

13

recovery in this case, or the recovery of funds by other creditors of ESP LLC or SGS, and the Bankruptcy trustee.

*The Movant's Probability of Success on the Merits*

Rather than demonstrate a mathematical probability of success on the merits, a movant must show a "fair chance of prevailing" after discovery, formal procedures, complete evidence and a full trial on the merits. *Heartland Academy Cmty. Church v. Waddle,* 335 F.3d 684, 690 (8th Cir. 2003). The Nebraska Supreme Court set forth the elements of a tortious interference claim in *Huff v. Swartz,* 606 N.W.2d 461, 466 (Neb. 2000).  The elements of tortious interference with a business relationship or expectation are (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.  *Id.*

With regard to MTI's first claim that the Defendants tortiously interfered with MTI's business relationships with the school districts, there seems to be no dispute that MTI had valid business relationships with approximately 180 Nebraska school districts in 2005, and that O'Hara and Lange, and the Defendants, through their various roles as MTI competitors, employees, or business associates, knew of those business relationships. With regard to the third, fourth, and fifth elements of tortious interference, MTI contends that the Defendants intentionally and unjustifiably interfered with its business relationships with the school districts, or, at a minimum, interfered with the non-renewal notification process and steered school districts away from MTI to prevent it from competing for such business after August 2005.  MTI has produced compelling evidence showing that Baril,

14

Shepherd and Kiser were working to further the interests of SGS in direct contravention to the interests of MTI while they were still employed by MTI.   There is evidence that, but for the Defendants' allegedly unfair tactics, MTI would have retained the school district's business in 2006, just as it had for the preceding six years, due to automatic renewal provisions.

For the purposes of this motion, I conclude that it is likely that MTI will succeed in showing that Lange and O'Hara, in conjunction with Baril, Kiser, and Shepherd, tortiously interfered with MTI's business relationship and expectation with the school districts.   The computer forensic work that retrieved e-mail correspondence between O'Hara, Lange, Baril, Kiser, and Shepherd provides strong evidence that the Defendants were actively working and plotting against MTI.

To have standing to make a RICO claim, a party must have 1) sustained an injury to business or property 2) that was caused by a RICO violation.  *Asa-Brandt, Inc. v. ADM Investor Services, Inc.*, 344 F.3d 738, 752 (8th Cir. 2003) (citing *Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 951 (8th Cir.1999).  A RICO violation is shown when the plaintiff proves the defendant "engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Handeen v. Lemaire,* 112 F.3d 1339, 1347 (8th Cir. 1997).  In proving that an "enterprise" exists, a plaintiff must show "a common or shared purpose, some continuity of personnel, and an ascertainable structure distinct from the pattern of racketeering."  *Id.* citing *Handeen*, 112 F.3d at 1351.

It appears likely that MTI will succeed on its RICO claim. MTI has sustained an injury to its business, and there is evidence that it would not have been injured except for the

actions of O'Hara and Lange, and they are continuing to cause harm by using ESP LLC to avoid liability.  It appears that MTI will be able to show that through the use of the mail and wires, Baril, O'Hara, Lange and others engaged in an enterprise to defraud MTI. Additionally, the deposition testimony and documents in this case, show a pattern of racketeering.  I find that it is more likely than not that MTI will succeed on the merits of its RICO claim against Lange, O'Hara, and ESP LLC.

Federal Rule of Civil Procedure 64 ("Seizure of Person or Property"), provides the following:

> At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought, subject to [certain] qualifications.

Fed. R. Civ. P. 64.  Under Nebraska law, the Court may order the attachment of a defendant's property under circumstances such as those presented in this case:

> The plaintiff, in a civil action for the recovery of money, may, at or after the commencement thereof, have an attachment against the property of the defendant when the defendant or one of several defendants (1) has absconded with the intent to defraud his or her creditors; (2) has left the county of his or her residence to avoid the service of a summons; (3) so conceals himself or herself that a summons cannot be served upon him or her; (4) is about to remove his or her property, or a part thereof, out of the county in which the property is located, with the intent to defraud his or her creditors; (5) is about to convert his or her property, or a part thereof, into money, for the purpose of placing it beyond the reach of his or her creditors; (6) has property, or rights, in action, which he or she conceals; (7) has assigned, removed or disposed of, or is about to dispose of his or her property, or a part thereof, with the intent to defraud his or her creditors; or (8) fraudulently contracted the debt or incurred the obligation for which suit is about to be or has been brought.

Neb. Rev. Stat. § 25-1001 (Reissue 1995).

16

MTI has shown by a preponderance of the evidence, for the purposes of this Motion, that Lange and O'Hara have removed or converted the assets of SGS in an attempt to place them outside of the control of this Court. I find it likely that they will do the same with the assets of ESP LLC. Thus, I find that MTI has shown by a preponderance of the evidence that it will prevail on the merits.

*Public Interest*

As indicated about the public interest is protected in that an injunction will prevent O'Hara and Lange from attempting another transfer of assets to prevent MTI's recovery in this case, or the recovery of funds by other creditors of ESP LLC or SGS, and the Bankruptcy trustee. Thus, I find that MTI has met its burden of showing the necessity of a preliminary injunction.

Therefore, even though I find that the Court should enter an order continuing the injunction, the issue remains as to whether the Bankruptcy automatic stay prevents the Court from doing so.

**AUTOMATIC STAY**

An automatic stay is triggered by the filing of a petition in bankruptcy, and it stays the continuation of prepetition litigation against the debtor. 11 U.S.C. § 362(a). That section specifically provides in part:

> A petition under section ... 301 ... of this title, ..., operates as a stay, applicable to all entities, of:
>
> (1) the commencement or continuation, ..., of a judicial ... proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

17

11 U.S.C. § 362(a)(1). The automatic stay is broad in scope and applies to almost every formal and informal action against the debtor or property of the debtor, except as set forth under (b) of Section 362. 2 Lawrence P. King, et al., Collier on Bankruptcy ¶ 362.04, at 362-34 (15th ed. 1996). "The purpose of the automatic stay is to give the debtor a breathing spell from his creditors in which he may attempt a repayment or reorganization plan . . . The automatic stay also protects creditors by averting a scramble for the debtor's assets and promoting instead an orderly liquidation procedure under which all creditors are to be treated equally." *Farley v. Henson*, 2 F.3d 273, 274 (8th Cir.1993) (quotation omitted). So clearly, the automatic stay applies to SGS.

MTI argues that the automatic stay does not apply to ESP LLC because ESP LLC was used by O'Hara and Lange as an instrument of their RICO activities, and thus, ESP LLC is independently liable to MTI. (Filing No. 410, MTI Inc.'s Supplemental Brief in Support of Motion for Preliminary Injunction, p. 4-7). MTI also contends that the automatic stay does not apply to ESP LLC because the Trustee does not have standing to assert the alter ego claim.[11] Whether a creditor's alter ego claims are subject to the automatic stay depends upon the applicable state law and the extent to which those claims are property of the debtor corporation or reside in the individual creditors of the debtor. *In re Ozark Restaurant Equip. Co.*, 816 F.2d 1222 (8th Cir. 1987) (under Arkansas law, alter ego claims reside in creditors and not the corporation; therefore trustee has no standing to assert such

---

[11] There is no indication whether the Bankruptcy Trustee will attempt to pursue the assets of ESP LLC. However, it is clear that SGS and ESP LLC assert that they are separate entities. (*In re Strategic Governmental Solutions, Inc.*, Case No. 08-11047-1-rel (N.D.N.Y. April 7, 2008) (Filing No.1 and Filing No. 6, Appearance by counsel for ESP LLC).

claims). This Court has not previously made a specific finding that ESP LLC is an alter ego of SGS. If ESP LLC is an alter ego of SGS, the Court must consider whether the Bankruptcy Trustee can or will assert control over the assets of ESP LLC as part of the corporate debtor's estate.[12]

Federal courts generally look to state law to determine whether an entity is an alter ego of another in diversity actions. *See Loving Saviour Church v. United States,* 728 F.2d 1085, 1086 (8th Cir. 1984). However, this Court also has federal question jurisdiction in this matter under 28 U.S.C. § 1331 (RICO). In federal question cases, the Court looks to federal choice of law principles. "If the federal statute in question demands national uniformity, federal common law provides the determinative rules of decision." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979). "[T]he federal standard 'for when it is proper to pierce the corporate veil is notably imprecise and fact intensive." *Brotherhood of Locomotive Engineers v. Springfield Terminal Ry. Co.*, 210 F.3d 18 (1st Cir. 2000) (citing *Crane v. Green & Freedman Baking Co.*, 134 F.3d 17, 21 (1st Cir.1998). "Federal courts are not bound by 'the strict standards of the common law alter ego doctrine which would apply in a tort or contract action.'" *Id.* There is no "litmus test in the federal courts governing when to disregard corporate form. Instead, the rule in federal cases is founded

---

[12] It is not clear if the Bankruptcy Trustee will attempt to set aside as fraudulent conveyances the 2007 Transfer Agreement or other similar transfers of assets out of SGS. Any such claims by the Bankruptcy Trustee against third parties under state law to recover pre-bankruptcy transfers of the debtor's property are subject to the automatic stay because, once bankruptcy ensues, those claims become property of the estate and are to be asserted by the bankruptcy trustee for the benefit of all creditors. *A.H. Robins Co. v. Piccinin,* 788 F.2d 994 (4th Cir. 1986), cert. denied, 479 U.S. 876 (1986); *Seybolt v. Bio-Energy of Lincoln,* 38 B.R. 123 (Bankr. D. Mass. 1984).

only on the broad principle that 'a corporate entity may be disregarded in the interests of public convenience, fairness and equity.'" *Id.* (internal citations omitted).

Under Nebraska law, the factors relevant in determining whether a corporation is, or becomes, an alter ego of a person such that the corporate form should be disregarded include: diversion by the shareholder or shareholders of corporate funds or assets to their own or improper uses and the fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity. *Medlock v. Medlock*, 642 N.W.2d 113, 124 (Neb. 2002); *see also Southern Lumber & Coal Co. v. M.P. Olson Real Estate and Const. Co., Inc.*, 426 N.W.2d 504, 509 (Neb. 1988) "Among the factors relevant in determining whether to disregard the corporate entity are grossly inadequate capitalization, insolvency of the debtor corporation at the time the debt is incurred, diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses, that the corporation is a mere facade for the personal dealings of the shareholder, and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity." *Id.* These factors "are not acts of fraud in themselves but, rather, are elements of circumstantial proof of fraud." *Id.* Other factors include "the absence of corporate formalities, the commingling of corporate and personal funds and expenses, and the family relationship between corporate officers." *Horton Dairy, Inc. v. United States*, 986 F.2d 286, 289 (8th Cir. 1993); *Baum Hydraulics Corp. v. U.S.*, 280 F. Supp. 2d 910, 916 (D. Neb. 2003).

The record reflects that O'Hara is the only shareholder of SGS. O'Hara and his son, Abraham, are the only partners of ESP LLC. In 2007, O'Hara, as President, Chief Executive Officer, and sole shareholder of SGS, signed a "Transfer Agreement." The terms of the Transfer Agreement provide that "SGS has decided to wind down its business operations - and to terminate its status as an optional company." (Filing No. 381-5). Additionally, the Agreement states, "SGS wishes to transfer all of its assets – and some of its liabilities – to an entity that is qualified and willing to fulfill all of SGS' existing duties and responsibilities, to pay off the liabilities that SGS transfers to ESP, and to accept the assets that SGS wishes to transfer as compensation-in-full for taking on those obligations." (*Id.* p. 1.) The Transfer Agreement provides that "in consideration of the premises and the promises set forth herein – and for other good and valuable consideration, the adequacy of which and the transfer of which are hereby acknowledged by both entities . . ." (*Id.* pp. 1-2.) SGS transferred to ESP the following assets "Accounts Receivable, Contractual Agreements, Equipment, Furniture, and Miscellaneous." SGS allegedly transferred "Credit Card Accounts," but the Bankruptcy Petition shows that SGS did not do so, claiming over $200,000 in unsecured credit card debt. (Bankruptcy Petition, Schedule F).

The record also shows that SGS and ESP LLC continue to commingle their assets and personnel. In his affidavit submitted on April 2, 2008, in support of SGS's Motion to Set Aside Default Judgment [sic], O'Hara states that although all the assets of SGS were transferred to ESP LLC in July of 2007, ESP LLC had agreed to "permit SGS to utilize a portion of NASB's quarterly payment to pay [SGS's attorneys] in 2008." (Filing No. 394, Affidavit of Joseph J. O'Hara, p. 2). O'Hara has signed a demand letter to the NASB identifying himself as in-house counsel for ESP LLC and ESP LLC's Managing Director.

21

(Filing No. 381-5, March 21, 2008 correspondence from O'Hara to Andre R. Barry, Counsel for NASB).  However, in the Transfer Agreement, O'Hara's son, Abraham, was listed as the Managing Partner of ESP LLC.

According to the Bankruptcy Petition, SGS has $54.48 in assets in a bank account and over $14 million in debts. (Bankruptcy Petition, Summary of Schedules).  It appears that the 2007 Transfer Agreement removed all assets from SGS, but left all the liabilities. For the period of January 1, 2005, through June 30, 2007, SGS Nebraska's operations alone, had Consulting Income of $3,430,119.83 and Net Ordinary Income (after expenses) of $1,099,417.17.[13] (Filing No. 381-4).  However, less than one year later, as a result of the Transfer Agreement, and possibly other fraudulent transfers, SGS had no assets.  For the forgoing reasons, the Court finds that ESP LLC is an alter ego of SGS under Nebraska law. Because Nebraska law sets a higher burden than federal law on this subject, I find that MTI has also met the burden of showing that ESP LLC is an alter ego of SGS under federal law.

Next, the Court must address whether it is prohibited under the automatic stay provisions 11 U.S.C. § 362 from entering a preliminary injunction against ESP LLC and the ESP LLC Partners.  To do so, the Court must determine whether the assets ESP LLC are considered to be part of the Bankruptcy Estate.  A trustee of a corporate defendant has standing to pierce the corporate veil, based on an alter ego theory, as against the controlling stockholder if (1) under governing state law the debtor could have asserted an alter ego claim to pierce its own corporate veil, and (2) the claim is a general one, with no

---

[13] MTI has also raised concerns that all the expenses listed may not be legitimate expenses and, thus, the actual income is much higher.

particularized injury arising from it, and if that claim could be brought by any creditor of the debtor. *Kalb, Voorhis & Co. v. American Financial Corp.* 8 F.3d 130, 132 (2d 1993) (quoting *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 700-01 (2d Cir. 1989)).

Bankruptcy courts normally determine whether any alter ego claims are included in the bankruptcy estate by looking at the law of the state where the corporate debtor is incorporated. *Kalb, Voorshis*, 8 F.3d at 132. "The law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders: 'Because a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away.'" *Id.* (citing *Soviet Pan Am Travel Effort v. Travel Committee, Inc.*, 756 F. Supp. 126, 131 (S.D.N.Y.1991) (applying New York choice of law principles). See also Restatement (Second) of Conflict of Laws § 307 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation ... and to its creditors for corporate debts.")).

MTI argues that instead of applying Delaware law, where SGS is incorporated, the Court should apply Nebraska law under the "most significant relationship" test. *Schwan v. CNH America* LLC, 4:04CV3384, 2006 WL 1215395 at *17 (D Neb. 2006) (abrogated on other grounds, *Malmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748 (8th Cir. 2006)). In the alternative, MTI argues that the Court should apply Michigan law, where ESP LLC is

incorporated.[14]  At this time, I find that it is not necessary to determine which state law applies, because I find that the claims against ESP LLC, O'Hara and Lange are not ones that are applicable to all creditors.

A RICO claim, where the shareholders were instrumental in the fraud, provides a case where the injury to the creditor is different from a general one which can be brought by any creditor.  *In re Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271 (7th Cir. 1989).  In *Arnett*, the plaintiffs, four oil suppliers, alleged that the defendant, Toy and Thomas Arnett orchestrated a fraud through a subsequently bankrupt corporation owned by them.  *Id.* at 1272.  The Arnetts argued that the plaintiffs lacked standing to bring the lawsuit because only the trustee in bankruptcy would have the right to sue the Arnetts.  *Id.* at 1280.  The Seventh Circuit recognized that while the bankruptcy trustee can bring a cause of action based on an alter ego theory against the shareholders, the plaintiffs in this case had shown injury distinct from other creditors.  The court concluded that while "part of the scheme was

---

[14]  The Eighth Circuit, in applying Arkansas and Missouri state law, has held that trustees lack standing to assert alter ego claims.  *In re Ozark Restaurant Equip. Corp.* 816 F.2d 1222, 1225 (8th Cir. 1987); *Mann v. Michael Indus. Inc.,* 90 B.R. 981, 985-86 (Bankr. E.D.Mo. 1988).  MTI argues that Nebraska law, which is similar to Arkansas and Missouri on this issue, would also prevent the trustee from asserting alter ego claims. Similarly, MTI argues that under Michigan law, the Bankruptcy Trustee lacks standing to assert an alter ego claim.  *In re RCS Engineered Products, Co., Inc.,* 102 F.3d 223 (6th Cir. 1996) (holding that under Michigan law a subsidiary does not have standing to sue its shareholders or its parent company under an alter ego theory).  The application of Delaware law would provide a different result.  Under *Murray v. Miner*, 876 F. Supp. 512, 517 (S.D.N.Y. 1995), district court held that the claim of a corporate debtor to pierce its own corporate veil is permitted under Delaware law.  Finding that such claims are similar to breach of fiduciary duty claims brought by a subsidiary against a parent.  *Id.  Murray* further held that a veil-piercing claim is a general one which can be brought by any creditor and, therefore, the bankruptcy trustee has standing to bring the claim.  *Id.* at 517.

24

the diversion of corporate assets, an essential part of the scheme, on which its success depended, was the fraudulent taking from the plaintiffs . . . " *Id.*

In *In re Eagle Enterprises, Inc.*, 265 B.R. 671, 680 (E.D. Pa. 2001), the court adopted the reasoning of the Eighth Circuit in *Stone's Pharmacy v. Pharmacy Accounting Mgmt., Inc.,* 875 F.2d 665 (8th Cir. 1989), to determine that the automatic stay did not apply to a creditor's tortious interference claim against a third party who purchased most of the debtor's assets and then allegedly caused the debtor to breach its contract with the creditor.

In this case, MTI has an injury that is distinct from the general creditors in that O'Hara, in conjunction with Lange, has used SGS and ESP LLC, to engage in a pattern of racketeering to harm MTI.  The entire scheme depended on SGS acquiring, and through ESP LLC, maintaining, all of MTI's business.  Thus, I find that the claims of MTI against ESP LLC, O'Hara and Lange are not subject to the automatic stay.

If the Bankruptcy Trustee proceeds to collect the assets of ESP LLC for the Bankruptcy Estate, and the Bankruptcy Court finds that the trustee is entitled to pierce ESP LLC's veil, or recoup the funds as part of a fraudulent transfer, then this Court will yield to the Bankruptcy Court.  In the interim, this Order will preserve those assets.  I conclude that this Court has the authority to continue the injunction against ESP LLC,  O'Hara, and Lange, and those working in concert with them.

Accordingly,

IT IS HEREBY ORDERED:

1.      Plaintiff MeccaTech, Inc.'s Motion for a Preliminary Injunction (Filing No. 379) is granted;

25

2.     Educational Services & Products, LLC ("ESP LLC"), and its officers, directors, subsidiaries and affiliates, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them including, but not limited to, Joseph O'Hara, Gary Lange, Derek Abraham, and Michael Martin, who receive actual notice of this Order by personal service or otherwise, and each of them; are enjoined from transferring funds, assets or other property of ESP LLC, **outside the ordinary course of business,** including any such assets ESP LLC may obtain in the future.  ESP LLC may move the Court for approval of any transaction that may be viewed as occurring outside the ordinary course of business.

3.     In addition to paragraph 2, ESP LLC is prohibited from transferring any funds, assets or other property of ESP LLC to Joseph O'Hara, Gary Lange, Derek Abraham, and Michael Martin.

4.     Pursuant to Rule 65(c), the Court in its discretion does not require the Plaintiff to post a bond with the Clerk of Courts of the United States District Court for the District of Nebraska.  However, it is noted that the Court Registry currently holds funds in the Interpleader Action that may be used to satisfy any damages incurred by ESP LLC as the result of this injunction.

5.     ESP LLC and its officers, directors, subsidiaries and affiliates, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them, including but not limited to Joseph O'Hara, Gary Lange, Derek Abraham, and Michael Martin, who receive actual notice of this Order by personal service or otherwise, and each of them, are hereby restrained from destroying, mutilating, concealing, altering, or disposing of any document referring or relating in any manner to any transactions described in the Complaint in this action, or to any communications between or among any of the Defendants. As used in this order, "document" means the original and all non-identical copies (whether non-identical because of handwritten notation or otherwise) of all written or graphic matter, however produced, and any other tangible record, or electronic data compilation capable of reproduction in tangible form, including, without limitation, correspondence, e-mails, memoranda, minutes, telephone records, reports, studies, telexes, diaries, calendar entries, contracts, letters of agreement, and including any and all existing drafts of all documents.

6.     Service of this Order shall be made via CM/ECF on all parties, including Gary W. Lange, listed as an Interested Party, and may additionally be made by email, facsimile, mail, overnight delivery to the business address of any defendant, or special process server, or any other person, or in any other manner authorized by Rule 5 of the Federal Rules of Civil Procedure and

may be made on any registered agent, officer, or director of defendants, or by publication.

9.    In addition to the service above, the Clerk of the Court shall send a copy of this Order via email and  first-class mail to Joseph J. O'Hara at:

        THE O'HARA GROUP & ASSOCIATES
        1025 Connecticut Avenue N.W.
        Washington, DC 20036
        TOGALawFirm@aol.com

and to Joseph J. O'Hara at:

        19 Dove Street Suite 104
        Albany, NY 12210-1346
        jjohara@espllc.com

and to Paul A. Levine at:

        Lemery Greisler, LLC
        50 Beaver Street, 2nd Floor
        Albany, NY 12207
        plevine@lemerygreisler.com.


DATED this 15th day of April, 2008.


            BY THE COURT:


            s/Laurie Smith Camp
            United States District Judge