## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **MECCATECH, INC.,** | ) | CASE NO. 8:05CV570 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM |
| | ) | AND ORDER |
| **CLAUDIA KISER, SARAH SHEPHERD,** | ) | |
| **PAT BARIL, STRATEGIC** | ) | |
| **GOVERNMENTAL SOLUTIONS, INC.,** | ) | |
| **NEBRASKA ASSOCIATION OF** | ) | |
| **SCHOOL BOARDS,** | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court are Plaintiff's Motion to Dismiss (Partial) (Filing No. 222),[1] Plaintiff's Motion for Summary Judgment (Filing No. 256);[2] and a Joint Stipulation (Filing No. 289). Plaintiff MeccaTech, Inc.'s ("MTI") Motion for Summary Judgment requests that the Court dismiss counterclaims filed by Claudia Kiser, Sarah Shepherd and Pat Baril (collectively "the Former Employees") for accrued but unused sick pay, and Baril's counterclaim for a bonus allegedly owed him as a result of collecting Audit Adjusting Holdback money for MTI. MTI also contends it is entitled to judgment as a matter of law on Count Three of MTI's

---

[1] MTI's Motion to Dismiss (Partial) requests the dismissal of Baril's counterclaim for unpaid sick leave. The arguments contained in that motion are reiterated in the Plaintiff's Motion for Summary Judgment (Filing No. 256), but include additional evidence and are expanded to include the counterclaims of Defendants Claudia Kiser and Sarah Shepherd for unpaid sick leave. Because the Court is granting the Motion for Summary Judgment (Filing No. 256), it is not necessary to reach a determination on the merits of the Motion to Dismiss (Partial) (Filing No. 222).

[2] MTI's motion also requests summary judgment as to Nebraska School Board Association, now dismissed as a party. The Court deems that request moot.

First Amended Complaint, regarding whether Baril and Shepherd breached their duties of loyalty to MTI.

### STANDARD OF REVIEW

In the context of a summary judgment motion, the Court's function is to consider the evidence and determine whether the moving party is entitled to judgment as a matter of law. The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (quoting Fed. R. Civ. P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.* Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.,* 477 U.S. at 327.

### PAT BARIL'S CLAIM FOR A BONUS

On October 2, 2007, Baril filed an Amended Counterclaim in which he contends that MTI owes him $85,676.00 for an unpaid bonus.[3] (Filing No. 213, Amended Complaint).

---

[3] In determining whether Baril is entitled to the alleged bonus, the Court relies on factual allegations contained in Baril's Amended Complaint, his deposition testimony and

Baril asserts in his Amended Counterclaim that, during the summer of 2002, MTI assigned him the job of obtaining an Audit Adjustment Holdback. (*Id.* ¶ 7). Baril alleges that the former President of MTI, Gary Lange, promised Baril that if all the holdback monies were paid, Baril would receive 10% of MTI's fees as a bonus. The bonus was to be paid at the time the Audit Adjustment Holdback funds were received by MTI. (*Id.* ¶ 8). Two years later, on October 1, 2004, MTI received $856,760.00 in fees as a result of the collection of the Audit Adjustment Holdback funds. (*Id.* ¶ 10). Baril claims that in the fall of 2004 he

---

the Index of Evidence provided by MTI. Baril filed his own affidavit in opposition to the Motion for Summary Judgment (Filing No. 277, Exhibit BB) and the affidavit of Ralph Sweitzer (Filing No. 277, Exhibit CC). Baril claims that after his March 22, 2007, deposition, he "refreshed his recollection" as to when the bonus promise was made. Baril now states in his affidavit that the promise was made at a meeting in Michigan in April 2002. In his Amended Complaint, filed October 2, 2007, however, Baril states that the promise was made to him in the summer of 2002. In addition to providing contradictory information as to the date the promise was made, Baril's affidavit also contradicts his prior deposition testimony regarding who was present when the promise was made. Baril does not provide any explanation for this change. Baril did not provide the "recollected" information in any responses to discovery requests, including interrogatories, and did not amend his responses after "refreshing his recollection". Similarly, Sweitzer's affidavit directly contradicts the prior testimony of Lange and Baril regarding the date the alleged promise was made and who was present. Further, Sweitzer attempts to provide evidence of events that happened after Sweitzer left MTI and of which he has no personal knowledge. These affidavits so contradict prior sworn testimony in this matter that they cannot create a genuine issue of material fact in this case. The very purpose of summary judgment under Rule 56 is to prevent "the assertion of unfounded claims or the interposition of specious denials or sham defenses." *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983) (citing, 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2712 (1983). If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. *Id.* Baril's and Sweitzer's affidavits directly contradict the Amended Complaint, the prior sworn testimony of Baril and Lange, the answers to discovery provided by Baril, and the uncontroverted evidence in this case, and will not serve to avoid summary judgment. *See, Camfield Tires, Inc.*, 719 F.2d at 1365 (holding that a secretary's affidavit could not be used to contradict her boss's deposition testimony).

requested the 10% bonus from Gary Tyler, then President of MTI, but Tyler refused to make the payment. (*Id.* ¶ 11 and 12). MTI contends that the claim for the bonus should be dismissed because the promise for payment was not definite, Baril provided no consideration for the alleged promise, and Lange and Sweitzer lacked authority to make the alleged promise because when the promise was made MTI was in a receivership.

The parties agree that Michigan law applies to the limited issue of Baril's alleged bonus. Michigan law has long held that a managing director of a company does not have the power to promise an employee a bonus based on a percentage of the company's profits. "Such an agent is not clothed, by virtue of his agency, with power to contract with an employee for an interest in his principal's business, or an interest in the profits thereof." *Deffenbaugh v. Jackson Paper Mfg. Co.*, 120 Mich. 242, 79 N.W. 197 (1899); *see also Noyes v. Irving Trust,* 250 A.D. 274, 294 N.Y.S. 2 (N.Y. App. 1937) ("[T]he bonus claimed was to be based upon a percentage of profits of the bankrupt's business. It is well settled that a contract of this character is not the usual and ordinary contract which one authorized to employ agents and servants may make. It would require express authority. . . . [T]he bankrupt's manager of sales, did not have authority to bind the bankrupt to pay the bonus here in question; nor would the bankrupt's president have authority so to do.").

The evidence in this case shows that, at the time the alleged promise was made, MTI was in receivership. The parties agree that while MTI was in a receivership, MTI's Receiver, Thomas Woods, had to approve any salary increase, bonus or stock issuance that was offered to any employee of MTI. (Filing No. 258-12, Woods Aff. ¶ 4). Woods did not approve any bonus, salary increase or stock issuance to Baril. (*Id.* ¶ 3). Neither do the

4

books and records of MTI, including audited financial statements, reflect that a bonus was to be paid to Baril. (*Id.* ¶ 6).

No genuine issue of material fact exists and, as a matter of law, Baril is not due any bonus or other payment from MTI for the collection of the Audit Adjustment Holdback.

## UNPAID SICK LEAVE

The parties do not dispute the relevant facts related to the Former Employees' claim for unpaid sick leave. On September 26, 2006, Shepherd and Kiser filed separate Counterclaims for accrued but unused sick leave in the amount of $1,884.54 and $1,615.04, respectively. (Filing Nos. 90 and 91). Baril's Amended Counterclaim also seeks $3,692.31 for accrued but unused sick leave. (Filing No. 213). Under MTI's operative Employee Handbook, the Former Employees were not entitled to payment for earned but unused sick or personal days upon separation of employment. (Filing No. 258-11, Ex. S, p. 5).

The parties agree that Nebraska substantive law applies to the payment of sick leave. The Former Employees argue that under *Roseland v. Strategic Staff Management, Inc.*, 722 N.W.2d 499 (Neb. 2006), they are entitled to payment for accrued but unused sick leave at the time of separation from their employer. In *Roseland*, the Nebraska Supreme Court interpreted Nebraska's Wage Act to require employers to pay employees for their accrued but unused *vacation* time at the time of separation regardless of the terms of the Employment Agreement barring this payment. *Id.* at 501. In 2007, after the *Roseland* decision, and after the Former Employees' separation, the Nebraska Wage Act

was modified. The Former Employees argue that the statute should apply as it was written at time of their separation. The pre-amendment Wage Act provided in relevant part:

> (3) Fringe benefits shall include sick and vacation leave plans, disability income protection plans, retirement, pension, or profit-sharing plans, health and accident benefit plans, and any other employee benefit plans or benefit programs regardless of whether the employee participates in such plans or programs; and
>
> (4) Wages means compensation for labor or services rendered by an employee, including fringe benefits, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis.

*Roseland*, 722 N.W.2d at 439-40; citing Neb. Rev. Stat. § 48-1229 (Reissue 1998). MTI argues that the post-amendment Wage Act should apply to this matter. The revised section provides as follows:

> (4) Wages means compensation for labor or services rendered by an employee, including fringe benefits, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis. ***Paid leave, other than earned but unused vacation leave, provided as a fringe benefit by the employer shall not be included in the wages due and payable at the time of separation, unless the employer and the employee or the employer and the collective-bargaining representative have specifically agreed otherwise.***

Neb. Rev. Stat. § 48-1229 (West, Westlaw through 2007 LB255) (emphasis added). MTI contends that even if the prior statute is applied, the Former Employees are not entitled to sick leave because they had not met the "conditions stipulated," a requirement of the pre-amendment Wage Act.

It is not necessary for the Court to determine which version of the Wage Act should apply or whether the payment for unused sick leave was mandatory prior to 2007,[4]

---

[4] Prior to its decision in *Roseland*, the Nebraska Supreme Court reviewed the requirement for payment for accrued sick leave under the Wage Act in *Professional*

6

because the Former Employees have not demonstrated that they have satisfied the "conditions stipulated."

The common stipulated condition for sick leave eligibility is *sickness* on the part of the employee or a family member who requires the employee's care. That condition is stipulated by inference in the term "sick" leave, whether or not a company's policies and procedures describe in detail the proper uses for such leave. A number of courts have found that the payment of sick leave is contingent on the employee being sick. *See Williams v. Riverside Cmty. Corr. Corp.*, 846 N.E.2d 738, 750 (Ind. Ct. App. 2006); *Christian v. Ontario County,* 399 N.Y.S.2d 379, (N.Y.S. 1977) ("[W]here there is no provision for a cash payment on termination, these sick leave benefits are contingent upon the employee becoming sick during the term of employment and they are lost upon termination of the employee or at least upon his termination while in a healthy condition"); *Hillman v. U.S. Postal Service*, 257 F. Supp. 2d 1330, 1337 (D. Kan. 2003) ("Sick leave is permissible time off from work when an employee is ill, not something that accrues a dollar value if an employee is well. In the absence of proof that the employer's policy is to pay employees for their accrued, unused sick leave upon termination from employment, no sick leave payment is owed"); *Teamsters, Local 117 v. Northwest Beverages, Inc.*, 976 P.2d

---

*Business Services Co. v. Rosno*, 680 N.W.2d 176, 188 (Neb. 2004). In *Rosno*, the employee handbook expressly provided for the payment of accrued sick leave at the time of termination. *Id.* at 188. Because the Employee Handbook in *Rosno* required the payment for accrued sick leave, the Court did not address whether one needed to be sick in order to recover sick leave. However, the Court did look at the terms of the Employment Agreement to determine the amount of sick leave that had accrued. The Court limited the amount of accrued leave, determining that Rosno was not entitled to leave he would have accumulated over an additional 90 day period because Rosno breached the Employment Agreement. *Id.* at 189.

1262, 1263 (Wash. Ct. App. 1999) ("Sick leave . . . is a contingent benefit due only in the event an employee misses work due to illness. We hold that the statutory right to wages due upon termination of employment does not create a substantive right to be paid for accrued sick leave.")

This Court must determine whether the Former Employees met the "conditions stipulated" to receive payment for sick leave upon separation. The Former Employees have provided no evidence that MTI authorized the payment of accrued sick leave upon separation from employment, or that the commonly recognized and inferred condition of sick leave eligibility, *i.e.*, *sickness* on the part of the employee or a dependent family member, would not be applicable in the state of Nebraska. The Former Employees, therefore, are not entitled to payment of their accrued sick leave as a matter of law.[5]

## DUTY OF LOYALTY[6]

Bob Fischl, a former MTI employee later employed by SGS, allegedly asked Baril to assist SGS with SGS's Medicaid administrative claim processing in El Paso, Texas, pursuant to a verbal agreement between MTI and SGS. (Filing No. 258-9, Baril Dep. 40:14-21). Baril traveled to El Paso to perform services for SGS in the fall of 2004 and/or

---

[5] Because the Former Employees have not satisfied the requirements under either the pre- or post-amendment statute, the Court declines to determine whether the 2007 amendments to Neb. Rev. Stat. § 48-1229 are retroactive.

[6] The Plaintiff's brief in support of its motion for summary judgment contains statements of fact in compliance with NECivR 56.1(a). (Filing No. 257, pp. 3-12). Each statement of fact is supported by pinpoint references to the evidentiary materials relied upon, and the evidentiary materials have been submitted in compliance with NECivR 7.1(a)(2). The Defendants have not responded to those statements of fact as required by NECivR 56.1(b). Because of that failure to comply with NECivR 56.1, the Plaintiff's statements of fact, summarized herein, are "deemed admitted." NECivR 56.1(b)(1).

the winter of 2005 continuing through the spring of 2006.  (*Id.* at 45:4-7, 42:21-24).  Baril provided services for SGS in El Paso after the agreement between SGS and MTI fell through.  (Filing No. 258-7, Tyler Aff.).  SGS was aware in July 2004 that MTI and its employees were no longer authorized to perform services on behalf of SGS in connection with SGS's El Paso contract.  (Filing No. 258-9, O'Hara Depo. 118:18-23).  Baril resigned from MTI effective April 20, 2005, and, immediately thereafter, was employed by SGS, a competitor of MTI.  (Filing No. 258-11, Ex. Q).

No later than July 2004, Gary Tyler "directed [SGS] to stop using such information in view of the absence of any contractual relationship between Mecca Tech and [SGS] and to contact any potential customers to whom it had provided such information and make it clear that Mecca Tech and its personnel were not associated or working with [SGS]." (Filing No. 258-7, Tyler Aff. ¶ 14).  At least as of July 29, 2004, Tyler's affidavit made SGS aware that MTI employees were not authorized to conduct any services on behalf of SGS. (*Id.*)  In June 2004, while he was still employed by MTI, Baril drafted non-renewal letters ("Non-Renewal Letters") for Nebraska School Districts to sign and send to MTI so that their individual contracts with MTI would not automatically renew.  (Filing No. 258-2, Ex. B). Baril forwarded his draft of the letter to Joseph O'Hara, the President of SGS; Gary Lange, who was working for O'Hara; and John Bonaiuto of the Nebraska Association of School Boards, for their comments.  (Filing No. 258-11, Ex. R).

In June 2004, while employed by MTI, Baril informed O'Hara and Lange that he was "sure that we are going to have a great and profitable relationship" and that he and John Bonaiuto "both look forward to working together with you and your staff."  (Filing No. 258-2, Ex. E).  O'Hara asked Baril to "let me know if there is anything that we can do to encourage

NASB to hook up with us. Thanks!" (Filing No. 258-2, Ex. D). No later than March 2005, while still employed by MTI, Baril provided his resume to SGS to be used by SGS in attempting to gain business in Illinois. (Filing No. 258-7, Ex. C). While still employed by MTI, Baril encouraged other MTI employees to assist SGS in obtaining business from the Nebraska School Districts by suggesting on SGS's behalf that SGS would pay certain benefits to them if they could "get all the schools to transfer over" to SGS. (Filing No. 258-7, Ex. D).

As early as June 2004, Baril was negotiating the terms of the salary and benefits from SGS for himself as well as Kiser and Shepherd while he was employed by MTI. (Filing No. 258-2, Ex. C). Shepherd was employed by MTI until July 29, 2005, and immediately thereafter became an employee of SGS.

After he left MTI and joined SGS, but while Shepherd was still employed by MTI, Baril asked Shepherd to accept receipt of and retain several of the Non-Renewal Letters and then, once they were all gathered, take them to the Nebraska Association of School Boards for delivery to MTI. (Filing No. 258-10, Shepherd Depo. 114:2-11; 123:1-11). Shepherd was aware that Baril was employed by SGS, a competitor of MTI, and that SGS was interested in transferring the Nebraska School Districts' business from MTI to SGS, at the time she received and held the Non-Renewal Letters. (*Id.*) Shepherd failed to disclose to MTI that she had received a number of Non-Renewal Letters from Nebraska School Districts and that she was expecting similar letters from every School District which had contracted with MTI. (*Id.*) Further, she failed to disclose to MTI that she had been instructed by Baril, who was no longer an employee of MTI but rather was working for

MTI's competitor, to hold all the Non-Renewal Letters rather than forwarding them to Tyler. (*Id.* at 127:7-10)

Under Nebraska law, it is a generally recognized principle that an employee owes a duty of loyalty to his employer during the course of his employment. *See Cudahy Company v. American Laboratories, Inc.*, 313 F. Supp. 1339, 1346 (D. Neb. 1970). Such a duty is irrespective of the existence of a covenant not to compete or nonsolicitation clause. *Id.* This means that during the course of their employment, employees must act with fairness and must not do anything harmful to their employers or their employers' interests. *Id.* Further, the Restatement (Second) of Agency § 387 at 201 (1958) provides that "[u]nless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." See also, *Vigoro Industries, Inc. v. Crisp*, 82 F.3d 785, 788 (8th Cir. 1996) (applying Arkansas law) (before leaving his employment, an employee has a duty of loyalty which precludes him from soliciting other employees or customers to leave the employer with him).

Baril and Shepherd argue that MTI has not been able to show that their actions were the proximate cause of the non-renewals because the contracts expired by their own terms. The Court finds this argument unpersuasive. Baril and Shepherd intentionally prevented MTI from discovering that the Districts were considering not renewing and, in the case of Baril, took steps to persuade the Districts not to renew. Baril and Shepherd engaged in actual competition with MTI while they were still employed by MTI which harmed MTI, and, thus, they violated their duty of loyalty. The Court finds that summary judgment should issue in favor of MTI and against Sarah Shepherd and Pat Baril as to the Third Cause of Action (Filing 227).

## CONCLUSION

For the reasons stated herein, the Court finds that summary judgment in favor of the Plaintiff is proper as to the Counterclaims of Pat Baril, Claudia Kiser and Sarah Shepherd as no genuine issue of material fact exists. The Court also finds that Pat Baril and Sarah Shepard breached their duties of loyalty as matter of law and Plaintiff is entitled to Judgment on Claim Three of its First Amended Complaint.

**IT IS HEREBY ORDERED**:

1. Plaintiff MeccaTech, Inc.'s Motion for Partial Summary Judgment (Filing No. 256) is granted;

2. Plaintiff MeccaTech, Inc.'s Motion to Dismiss (Partial) (Filing No. 222) is denied as moot;

3. The Joint Motion of the parties to substitute a signed copy of Exhibit CC to Defendants' Index of Evidence in Opposition to Plaintiff's Motion for Partial Summary Judgment (Filing Nos. 289 and 290) is granted;

4. Defendant and Counter-claimant Pat Baril's Amended Counterclaim (Filing No. 213) is dismissed with prejudice;

5. Defendant and Counter-claimant Claudia Kiser's Counterclaim (Filing No. 91) is dismissed with prejudice; and

6. Defendant and Counter-claimant Sarah Shepherd's Counterclaim (Filing No. 90) is dismissed with prejudice.

DATED this 21st day of April, 2008.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge